## UNITED STATES *v.* UNION PACIFIC RAILROAD COMPANY.

1. The solution of the question, whether the Union Pacific Railroad Company is required to pay the interest before the maturity of the principal of the bonds issued by the United States to the company, depends on the meaning of the fifth and sixth sections of the original act of 1862 "to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the government the use of the same for postal, military, and other purposes," and of the fifth section of the amendatory act of 1864. *Held,* upon consideration of said sections, of the scheme of said original act, and of the purposes contemplated by it, that it was not the intention of Congress to require the company to pay the interest before the maturity of the principal of the bonds.
2. As commonly understood, the word "maturity," in its application to bonds and other similar instruments, applies to the time fixed for their payment, which is the termination of the period they have to run.
3. A provision in the charter that the grants thereby made are upon the condition that the company "shall pay said bonds at maturity," while it implies an obligation to pay both principal and interest when the bonds shall become due, does not imply an obligation to pay the interest as it semi-annually accrues.
4. In construing an act of Congress, the court may recur to the history of the times when it was passed, in order to ascertain the reason for, as well as the meaning of, particular provisions in it; but the views of individual members in debate, or the motives which induced them to vote for or against its passage, cannot be considered.

APPEAL from the Court of Claims.

Under the authority of the second section of the act of Con-

gress of March 3, 1873,[1] the Union Pacific Railroad Company filed its petition in the Court of Claims, alleging that it had rendered services to the government in the transportation of the mails, troops, supplies, and public stores of the United States, between the dates of February, 1871, and February, 1874, both inclusive, and praying for judgment that the United States pay the company one half part of the amount due for such services, and give credit to the company on account of the bonds issued by the United States in aid of the construction of the road to the amount of the remaining half part of said amount.

The United States filed an answer and counterclaim denying their indebtedness, and alleging that they had issued to the company their coupon bonds to the amount of $100,000,000, bearing interest at the rate of six per cent per annum, payable semi-annually, pursuant to the acts of Congress of July 1, 1862, and July 2, 1864, and paid to the holders of said bonds, at the stated semi-annual periods, the interest due thereon; and that the company, although bound by law to reimburse them for payments so made for such interest, had never paid any part thereof; and they prayed judgment against the company for $12,000,000.

The provisions of the acts of July 1, 1862, and the amendatory act of July 2, 1864, which bear upon the questions at issue, are as follows:—

Act of July 1, 1862, 12 Stat., p. 489. "SECT. 5. The Secretary of the Treasury shall, upon the certificate in writing of said commissioners, . . . issue to said company bonds of the United States of

[1] That the Secretary of the Treasury is directed to withhold all payments to any railroad company and its assigns, on account of freights or transportation over their respective roads, of any kind, to the amount of payments made by the United States for interest upon bonds of the United States issued to any such company, and which shall not have been reimbursed, together with the five per cent of net earnings due and unapplied, as provided by law; and any such company may bring suit in the Court of Claims to recover the price of such freight and transportation; and in such suit the right of such company to recover the same upon the law and the facts of the case shall be determined, and also the rights of the United States upon the merits of all the points presented by it in answer thereto by them; and either party to such suit may appeal to the Supreme Court; and both said courts shall give such cause or causes precedence of all other business."

one thousand dollars each, payable in thirty years after date, bearing six per centum per annum interest, said interest payable semiannually, . . . to the amount of sixteen of said bonds per mile; . . . and to secure the repayment to the United States, as hereinafter provided, of the amount of said bonds so issued and delivered to said company, together with all interest thereon which shall have been paid by the United States, the issue of said bonds and delivery to the company shall *ipso facto* constitute a first mortgage on the whole line of the railroad and telegraph, together with the rolling stock, fixtures, and property of every kind and description; and, in consideration of which, said bonds may be issued; and on the refusal or failure of said company to redeem said bonds, or any part of them, when required to do so by the Secretary of the Treasury, in accordance with the provisions of this act, the said road, with all the rights, functions, immunities, and appurtenances thereto belonging, and also all lands granted to the said company by the United States which at the time of said default shall remain in the ownership of said company, may be taken possession of by the Secretary of the Treasury for the use and benefit of the United States.

" SECT. 6. The grants aforesaid are made upon condition that said company shall pay said bonds at maturity; . . . and all compensation for services rendered for the government shall be applied to the payment of said bonds and interest until the whole amount is fully paid. Said company may also pay the United States, wholly or in part, in the same or other bonds, treasury notes or other evidences of debt against the United States, to be allowed at par; and after said road is completed, until said bonds and interest are paid, at least five per cent of the net earnings of said road shall also be annually applied to the payment thereof."

Act of July 2, 1864, 13 Stat., p. 356. " SECT. 5. Only one-half of the compensation for services rendered for the government shall be required to be applied to the payment of the bonds issued by the government in aid of the construction of said road."

The Court of Claims found in favor of the company, and adjudged that it recover from the United States $512,632.50, and that the counterclaim of the United States be dismissed.

The United States appealed to this court.

*Mr. Attorney-General Pierrepont* for the appellant.

The primal question is, whether the railroad company is

bound to reimburse the interest as the same falls due, or whether it may postpone the payment thereof (which the government advances half-yearly) until the maturity of the bonds.

Should the decision on this question be adverse to the appellant, then the only other question is, whether the government can retain all the earnings of the company made in the service of the government, or only half thereof.

In 1862, Walter S. Burgess and his associates obtained a charter from the United States to build the Union Pacific Railroad, subject to the conditions, *inter alia*, that the company shall do the government's transportation at rates not to exceed the amounts paid by private parties; that all compensation for services rendered for the government shall be applied to the payment of the bonds and interest; and that after the road is completed, until the bonds and interest are paid, at least five per centum of the net earnings shall be annually applied to the payment thereof.

Two years went by. This corporation then procured the passage of the act of 1864, which confers large additional donations and privileges. Sects. 5 and 10 grant an extension of one year for completing the road, and require that only one-half of the compensation for services rendered the government shall be applied to the payment of the bonds. They authorize the company, on the completion of each section of the road and telegraph line, to issue its bonds to an amount not exceeding the amount of those issued to it by the United States; and they give to the mortgage for securing its bonds priority over that of the United States.

In 1871, Congress required the Secretary of the Treasury to pay over to the company, in money, one-half of the compensation for services to the United States theretofore or thereafter rendered; but declared that this provision should not affect the legal rights of the government or the obligations of the company, except as therein specially provided.

In 1873, Congress passed the act of March 3.

It is submitted, *First*, The question before the court is, whether the United States are entitled to retain the whole value of the service which they have received from the company, and apply the same towards payment of the interest ad-

vanced from time to time by the government upon the bonds loaned to the company, — a question not embarrassed by the acts of 1864 and 1871, as they were repealed by the act of 1873.

The whole question of the liability of the company to pay the interest on the government bonds before their maturity is raised by the counterclaim set up by the United States, and is before the court.

*Second,* That the Union Pacific Railroad Company is a private corporation has been settled. *The Company* v. *Peniston,* 18 Wall. 31.

A grant of privileges and exemptions to a corporation is strictly construed. *Ohio Life & Trust Co.* v. *Debolt,* 16 How. 435; *Dubuque & Pacific R.R.* v. *Litchfield,* 23 id. 88, 89; Opinion of Attorney-General Black, 9 Opinions of Attorneys-General, 59, 60.

*Third,* Applying these and other well-settled principles of construction to the statutes relating to the company, there is no difficulty in arriving at their true meaning.

There is nothing ambiguous about the fifth section of the act of 1862. The government proposed to advance to the company bonds bearing interest at six per cent, "said interest payable semi-annually;" and, to secure them *according to their terms,* the company agreed to give a first mortgage, and also to give additional security for the *interest* as well as the principal. The mortgage was *executed* when the company received the bonds.

*Fourth,* By the act of 1864, the company is required to assume nothing; but the *absolute right* to amend or repeal is reserved.

*Fifth,* The fact that the company, under the act of 1864, issued its mortgage to secure the same amount of bonds as it was entitled to receive from the government, and made the interest thereon payable *half-yearly,* is conclusive as to the understanding of the company when it filed its assent to the provisions of the act.

*The Attorney-General* referred at some length to the consequences to the government should the decision be against it, and cited the debates in Congress on the passage of the act of 1862 as furnishing the clearest proof of the purpose of that body to require the immediate repayment by the company of the interest advanced by the government.

*Mr. Sidney Bartlett* and *Mr. E. W. Stoughton* for appellee.

The rule, that, where the entire purpose of a charter is to confer bounties on corporations, the construction of any provision therein about which there is doubt must be in favor of the government, does not extend to charters where there are stipulations for services, or pecuniary returns by the party endowed. *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420; *Ohio L. & T. Co.* v. *Debolt*, 16 How. 435; *Dubuque & P. R. Co.* v. *Litchfield*, 23 id. 88. That the charter of the Union Pacific Railroad Company contains such stipulations, either by condition or contract, cannot be controverted.

The only sections having a direct bearing upon the question at issue — the right of the government to have the immediate reimbursement of the interest paid by it — are five, six, and seventeen of the act of July 1, 1862, and five of the act of July 2, 1864. Under them, we submit, that while conditions are imposed on the company, a breach of which would work a forfeiture, there is no assumpsit or covenant, express or implied, *on which, by action at law or set-off*, the company can be compelled to reimburse the principal or interest of the bonds issued to it; but should we concede that such a covenant or assumpsit could be found in the charter, then the covenant or assumpsit to pay the interest is to pay the same as each bond or class of bonds *matures*, and not from time to time, each six months, as it shall have been paid by the government.

Upon an analysis of the charter as to the time at which the interest was to be reimbursed, it will be seen that the earliest clause is the mortgage clause set out in the fifth section of the act of 1862. It contains two provisions, neither of which fixes, in terms, the period at which either the bonds or the interest thereon is to be reimbursed. The words are, the " grants aforesaid are made on condition that the company shall pay said bonds at maturity." Will the court, then, import into the statute the words " and each semi-annual payment of interest as it accrues "? Unquestionably not. If such had been the purpose of Congress, why was it not so stated? One thing would seem clear from the terms used, — namely, that, whatsoever payment was to be made, *the period of such payment is definitely* fixed at the maturity of the bonds; and, if words are

to be interjected so as to include interest, why should further alterations be made by the insertion of a new and different period for its payment? These are the only provisions which apply to the *time* of payment.

The clauses as to the *mode* of payment are found in the sixth section.

Sect. 5 of the act of 1864 provides "that only one-half of the compensation for services rendered for the government by said companies shall be required to be applied *to the payment of the bonds* issued by the government." The act of March 3, 1871, sect. 9, and the proviso thereto reserving the rights of the government, were designed to leave open for legal construction the question of when and how interest was payable; and the purpose of the act of 1873 was not to repeal the charter, or any part of it, since it authorized the suit to be brought by the company against the United States to recover the price of freight and transportation due under existing laws. If Congress meant to repeal the provision for the payment of one-half of the transportation, it would have been an empty mockery to authorize a suit to recover for that very transportation. The right of the company to be paid in some form is indisputable; but its right to recover without its being subject to set-off was the one matter in controversy. The purpose of the act was to remit to judicial determination the question, whether, upon the true construction of the charter, the government was legally bound to pay the company for one-half the transportation; or whether it might retain that half, and apply it towards interest on the bonds.

MR. JUSTICE DAVIS delivered the opinion of the court.

The Union Pacific Railroad Company, conceding the right of the government to retain *one-half* of the compensation due it for the transportation of the mails, military and Indian supplies, and apply the same to reimburse the government for interest paid by it on bonds issued to the corporation to aid in the construction of its railroad and telegraph line, seeks to establish by this suit its claim to the other moiety. The United States, on the other hand, having paid interest on these bonds in excess of the sums credited to the company for services

rendered by it, insist upon their right to withhold payment altogether.   One of the grounds on which this right is sought to be maintained is by reason of the general right of set-off, which, as a general proposition, exists in the government, and is commonly exercised by it when settling with those having claims against it.   But, manifestly, the rules applicable to ordinary claimants for services rendered the United States do not apply to this controversy.   The bonds in question were issued in pursuance of a scheme to aid in the construction of a great national highway.   In themselves they do not import any obligation on the part of the corporation to pay; and whether, when the United States have paid interest on them, a liability to refund it is imposed on the company, depends wholly on the conditions on which the bonds were delivered to and received by it.   These conditions are embodied in the legislation of Congress on the subject; and if, on a fair interpretation of it, the corporation is found to be now a debtor to the United States, the deduction for interest paid on the bonds can be lawfully made.   But, if the converse of this proposition is true, the government cannot rightfully withhold from the corporation one-half of its earnings.

In construing an act of Congress, we are not at liberty to recur to the views of individual members in debate, nor to consider the motives which influenced them to vote for or against its passage.   The act itself speaks the will of Congress, and this is to be ascertained from the language used.   But courts, in construing a statute, may with propriety recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it.   *Aldridge* v. *Williams*, 3 How. 24; *Preston* v. *Browder*, 1 Wheat. 120.

Many of the provisions in the original act of 1862 are outside of the usual course of legislative action concerning grants to railroads, and cannot be properly construed without reference to the circumstances which existed when it was passed. The war of the rebellion was in progress; and, owing to complications with England, the country had become alarmed for the safety of our Pacific possessions.   The loss of them was feared in case those complications should result in an open

rupture; but, even if this fear were groundless, it was quite apparent that we were unable to furnish that degree of protection to the people occupying them which every government owes to its citizens. It is true, the threatened danger was happily averted; but wisdom pointed out the necessity of making suitable provision for the future. This could be done in no better way than by the construction of a railroad across the continent. Such a road would bind together the widely separated parts of our common country, and furnish a cheap and expeditious mode for the transportation of troops and supplies. If it did nothing more than afford the required protection to the Pacific States, it was felt that the government, in the performance of an imperative duty, could not justly withhold the aid necessary to build it; and so strong and pervading was this opinion, that it is by no means certain that the people would not have justified Congress if it had departed from the then settled policy of the country regarding works of internal improvement, and charged the government itself with the direct execution of the enterprise.

This enterprise was viewed as a national undertaking for national purposes; and the public mind was directed to the end in view, rather than to the particular means of securing it. Although this road was a military necessity, there were other reasons active at the time in producing an opinion for its completion besides the protection of an exposed frontier. There was a vast unpeopled territory lying between the Missouri and Sacramento Rivers which was practically worthless without the facilities afforded by a railroad for the transportation of persons and property. With its construction, the agricultural and mineral resources of this territory could be developed, settlements made where settlements were possible, and thereby the wealth and power of the United States largely increased; and there was also the pressing want, in time of peace even, of an improved and cheaper method for the transportation of the mails, and of supplies for the army and the Indians.

It was in the presence of these facts that Congress undertook to deal with the subject of this railroad. The difficulties in the way of building it were great, and by many intelligent persons considered insurmountable.

Although a free people, when resolved upon a course of action, can accomplish great results, the scheme for building a railroad two thousand miles in length, over deserts, across mountains, and through a country inhabited by Indians jealous of intrusion upon their rights, was universally regarded at the time as a bold and hazardous undertaking. It is nothing to the purpose that the apprehended difficulties in a great measure disappeared after trial, and that the road was constructed at less cost of time and money than had been considered possible. No argument can be drawn from the wisdom that comes after the fact. Congress acted with reference to a state of things believed at the time to exist; and, in interpreting its legislation, no aid can be derived from subsequent events. The project of building the road was not conceived for private ends; and the prevalent opinion was, that it could not be worked out by private capital alone. It was a national work, originating in national necessities, and requiring national assistance.

The policy of the country, to say nothing of the supposed want of constitutional power, stood in the way of the United States taking the work into its own hands. Even if this were not so, reasons of economy suggested that it were better to enlist private capital and enterprise in the project by offering the requisite inducements. Congress undertook to do this, in order to promote the construction and operation of a work deemed essential to the security of great public interests.

It is true, the scheme contemplated profit to individuals; for, without a reasonable expectation of this, capital could not be obtained, nor the requisite skill and enterprise. But this consideration does not in itself change the relation of the parties to this suit. This might have been so if the government had incorporated a company to advance private interests, and agreed to aid it on account of the supposed incidental advantages which the public would derive from the completion of the projected railway. But the primary object of the government was to advance its own interests, and it endeavored to engage individual co-operation as a means to an end, — the securing a road which could be used for its own purposes. The obligations, therefore, which were imposed on the company incorporated to build it,

must depend on the true meaning of the enactment itself, viewed in the light of contemporaneous history.

It has been observed by this court, that the title of an act, especially in congressional legislation, furnishes little aid in the construction of it, because the body of the act, in so many cases, has no reference to the matter specified in the title. *Hadden* v. *The Collector*, 5 Wall. 110. This is true, and we have no disposition to depart from this rule; but the title, even, of the original act of 1862, incorporating the appellee, seems to have been the subject of special consideration, for it truly discloses the general purpose of Congress in passing it. It is " An act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the government the use of the same for postal, military, and other purposes." That there should, however, be no doubt of the national character of the contemplated work, the body of the act contains these significant words: " And the better to accomplish the object of this act, — namely, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government at all times (but particularly in time of war) the use and benefits of the same for postal, military, and other purposes, — Congress may at any time, having due regard for the rights of said companies named herein, add to, alter, amend, or repeal this act." 12 Stat. p. 497. Indeed, the whole act contains unmistakable evidence, that, if Congress was put to the necessity of carrying on a great public enterprise by the instrumentality of private corporations, it took care that there should be no misunderstanding about the objects to be attained, or the motives which influenced its action.

If it had been equally explicit in the provision regarding the bonds to be issued in aid of the company, there would have been no occasion for this suit. But even in this particular, looking to the motives which prompted the act and to the objects intended to be effected by it, we do not think there is any serious difficulty in getting at the true meaning of Congress. The act itself was an experiment. It must be considered in the nature of a proposal to enterprising men to engage in the

work; for, with the untried obstacles in the way, there was no certainty that capital could be enlisted. If enlisted at all, it could only be on conditions which would insure, in case of success, remuneration proportionate to the risk incurred.

The proffered aid was in lands and interest-bearing bonds of the United States. There is no controversy about the terms on which the lands were granted; and the only point with which we have to deal relates to the nature and extent of the obligation imposed by Congress on the company to pay these bonds. It is not doubted that the government was to be reimbursed, both principal and interest; but the precise question for decision is, whether the company was required to pay the interest before the maturity of the principal.

The solution of this question depends upon the meaning of the fifth and sixth sections of the original act of 1862, and the fifth section of the amendatory act of 1864. The fifth section of the original act contains the undertaking of the government, and the sixth defines the obligation of the company. By the fifth it is provided, that, on the completion of the road in sections of forty miles, there shall be issued and delivered to the company a certain number of interest-bearing bonds of the United States, maturing thirty years after date, with interest payable semi-annually. And "to secure the repayment to the United States, as '*hereinafter provided,*' of the amount of said bonds, together with all interest thereon which shall have been paid by the United States," it is further provided that the issue and delivery of the bonds shall constitute a first mortgage on the property of the company, with a right reserved to the government to declare a forfeiture and take possession of the road and telegraph line in case "of the refusal or failure of the company to redeem said bonds, or any part of them, when requested to do so by the Secretary of the Treasury, *in accordance with the provisions of the act.*" The manifest purpose of this section is to take a lien on the property of the corporation for the ultimate redemption of the bonds, principal and interest; but the manner and time of redemption are left for further provision.

That the government was expected in the first instance to pay the interest is clear enough; for the mortgage was taken to

secure the repayment of the bonds, "together with all interest thereon which shall have been paid by the United States." This phrase implies a *prior* payment by the United States, whatever may be the duty of the corporation in regard to reimbursement as subsequently defined. Besides this, when repayment is spoken of, it is understood that something has been advanced which is to be paid back. Apart from this, had it been the intention that the corporation itself should pay the interest as it fell due, apt words denoting such a purpose would have been used. But when and how the reimbursement was to be made was declared to be " as hereinafter provided," — that is, in conformity with the terms prescribed in another portion of the act; and that this is so is evident enough from the latter part of the section, which directs the Secretary of the Treasury to enforce the forfeiture and take possession of the road on failure of the corporation to redeem said bonds, or any part of them (referring to the different periods of their issue), according to the plan of redemption thus provided, or, in other words, " in accordance with the provisions of this act." The obligations imposed on the corporation, or assumed by it, in relation to the repayment of the bonds, are set forth *entire* in the sixth section; which, on account of its importance, is here given at length : —

"Sect. 6. And be it further enacted, That the grants aforesaid are made upon condition *that said company shall pay said bonds at maturity*, and shall keep said railroad and telegraph line in repair and use, and shall at all times transmit despatches over said telegraph line, and transport mails, troops, and munitions of war, supplies and public stores, upon said railroad, for the government, whenever required to do so by any department thereof; and that the government shall at all times have the preference in the use of the same for all the purposes aforesaid (at fair and reasonable rates of compensation, not to exceed the amounts paid by private parties for the same kind of service) ; and *all compensations for services rendered for the government* shall be applied to the payment of said bonds *and interest* until the whole amount is fully paid. Said company may also pay the United States, wholly or in part, in the same or other bonds, treasury notes, or other evidences of debt against the United States, to be allowed at par; and *after said road is completed*, until said bonds and interest are paid, at least five per

centum of the net earnings of said road shall also be annually applied to the payment thereof."

Leaving out of consideration the parts of this section not pertinent to the present inquiry, there are three things, and three only, which the corporation is required to do concerning the bonds in controversy. 1st. To pay said bonds at maturity. 2d. To allow the government to retain the compensation due the corporation for services rendered, and apply the same to the payment of the bonds and interest until the whole amount is fully paid. 3d. To pay over to the government, after the road shall have been fully completed, five per cent of the net earnings of the road, to be appropriated to the payment of the bonds and interest.

If the language used is taken in its natural and obvious sense, there can be no difficulty in arriving at the meaning of the condition "to pay said bonds at maturity." As commonly understood, the word "maturity," in its application to bonds and other similar instruments, refers to the time fixed for their payment, which is the termination of the period they have to run. The bonds in question were bonds of the United States, promising to pay to the holder of them one thousand dollars thirty years after date, and the interest every six months. This obligation the government was required to perform; and, as the bonds were issued and delivered to the corporation to be sold for the purpose of raising money to construct its road, it is insisted that Congress must have meant to impose a corresponding obligation on the corporation. In support of this construction, it is sought to give to the word "maturity" a double signification, applying it to each payment of interest as it falls due, as well as to the principal. But this is extending, contrary to all legal rules, the operation of words by a forced construction beyond their real and ordinary meaning. Courts cannot supply omissions in legislation, nor afford relief because they are supposed to exist. "We are bound," said Justice Buller in an early case in the King's Bench, "to take the act of Parliament as they have made it: a *casus omissus* can in no case be supplied by a court of law, for that would be to make laws; nor can I conceive that it is our province to consider whether such a law that has been passed be tyrannical or not." *Jones* v. *Smart*, 1 T. R. 44–52.

Lord Chief Baron Eyre, in *Gibson* v. *Minet*, 1 H. Bl. 569–614, said, " I venture to lay it down as a general rule respecting the interpretation of deeds, that all latitude of construction must submit to this restriction; namely, that *the words may bear the sense* which by construction is put upon them. If we step beyond this line, we no longer construe men's deeds, but make deeds for them." This rule is as applicable to a statute as to a deed. The words " to pay said bonds at maturity " do not *bear the sense* which is sought to be attributed to them. They evidently imply an obligation to pay both principal and interest when the time fixed for the payment of the principal has arrived, but not to pay the interest as it accrues. It is one thing to be required to pay principal and interest when the bonds have reached maturity, and a wholly different thing to be required to pay the interest every six months, and the principal at the end of thirty years. The obligations are so different, that they cannot both grow out of the words employed; and it is necessary to superadd other words in order to include the payment of semi-annual interest as it falls due. Neither on principle nor authority is such a plain departure from the express letter of the statute warranted, especially when it leads to so great change in the condition annexed to the grant.

The failure to perform that condition is a cause of forfeiture. If the natural meaning of the words be adopted as the true meaning, there can be no forfeiture until the bonds themselves have matured. On the contrary, if the construction contended for be allowed, the grant is subject to forfeiture on each occasion that six months' interest falls due and is not met by the corporation. It would require a pretty large inference to draw from the language used authority to vary in a particular so essential the terms of a condition assumed by the corporation when it assented to the act. Besides this, when Congress imposed this condition, it well knew that the undertaking of the government bound it to pay interest every six months, and the principal at the time the bond matured. With this knowledge, dealing as it did with the relations the company was to bear to the government on the receipt of these bonds, it would, had it intended to exact the payment of interest before their maturity, have declared its purpose in unequivocal language. But if the

words, " to pay said bonds at maturity," do not give notice that this exaction was intended, neither do the other provisions of the sixth section.  They created no obligation to keep down the interest, nor were they so intended.  The provision for retaining the amount due for services rendered, and applying it towards the general indebtedness of the company to the government, cannot be construed into a requirement that the company shall pay the interest from time to time, and the principal when due.  It was in the discretion of Congress to make this requirement, and then, as collateral to it, provide a special fund or funds out of which the principal could be discharged. This Congress did not choose to do, but rested satisfied with the entire property of the company as security for the ultimate payment of the principal and interest, and in the mean time, with special provisions looking to the reimbursement of the government for interest paid by it, and to the application of the surplus if any remained, to discharge the principal.  The company, for obvious reasons, might be very willing to accept the bonds on these terms, and very unwilling to make an absolute promise to pay the interest as it accrued.  If it were in a condition, either during the progress or on the completion of the road, to earn any thing, there would be no hardship in applying the compensation due it; but, as can be readily seen, if it were required to raise money every six months to pay interest, when all its available means were necessary to the prosecution of the work, the burden might be very heavy. Congress did not see fit to impose it, and thus place the company in a position to incur a forfeiture of all its grants in case of failure to provide the means to pay current interest. Besides, it is fair to infer that Congress supposed that the services to be rendered by the company to the government would equal the interest to be paid.  That this was not an unreasonable expectation is shown by the published statistics of the vast ost of transporting military and naval stores and the mai to the Pacific coast by the modes of transit then in use.

The views presented on the provision for retaining the compensation are equally applicable to the provision, that, after the road is completed, five per cent of its net earnings shall

be *annually* applied to the payment of bonds and interest. It is not perceived how, on any principle of construction, an obligation of the corporation to pay the interest on the bonds every six months after they shall have been issued can be based on this provision, any more than on the other. Each created a reserved fund, out of which the government was to be reimbursed in the first instance the interest it had paid, leaving the surplus, if any, to be applied to the payment of the principal.

In addition to all that has been said, there is enough in the scheme of the act, and in the purposes contemplated by it, to show that Congress never intended to impose on the corporation the obligation to pay current interest. The act, as has been stated, was passed in the midst of war, when the means for national defence were deemed inadequate, and the public mind was alive to the necessity of uniting by iron bands the destiny of the Pacific and the Atlantic States. Confessedly the undertaking was beyond the ability of unaided private capital. Only by the helping hand of Congress could the problem, difficult of solution under the most favorable circumstances, be worked out. Local business, as a source of profit, could not be expected while the road was in course of construction, on account of the character of the country it traversed; and whether, when completed, it would prove valuable as an investment, was a question for time to determine. But vast as was the work, limited as were the private resources to build it, the growing wants as well as the existing and future military necessities of the country demanded that it be completed. Under the stimulus of these considerations Congress acted, not for the benefit of private persons, nor in their interest, but for an object deemed essential to the security as well as to the prosperity of the nation.

Compelled as it was to incorporate a private company to accomplish its object, it proffered the terms on which it would lend its aid. If deemed too liberal now, they were then considered, with the lights before it, not more than sufficient to engage the attention of enterprising men, who, if not themselves possessing capital, were in a position to command the use of it. These terms looked to ultimate security rather than im-

mediate reimbursement, inasmuch as the corporation would require all its available means in construction; and to require it, while the work was in progress, to keep down the interest on the bonds of the United States, might seriously cripple the enterprise at a time when the primary object of Congress was to advance it. There could, however, be no reasonable objection to the application "of all compensation for services rendered for the government" from the outset, and of "five per cent of the net earnings after the completion of the road" to the payment of the bonds and interest. These exactions were accordingly made.

Of necessity there were risks to be taken in aiding with money or bonds an enterprise unparalleled in the history of any free people, the completion of which, if practicable at all, would require, as was supposed, twelve years. But these risks were common to both parties. Congress was obliged to assume its share, and advance the bonds, or abandon the enterprise; for clearly the grant of lands, however valuable after the road was finished, could not be available as a resource for building it.

If the road were a success, in addition to the benefits it would confer on the United States, the corporation would be in a situation to repay the advances for interest and the principal when due. If, on the contrary, it proved to be a failure, subjecting the private persons who invested their capital in it to a total loss, there would be left the entire property of the corporation, of which immediate possession could be taken by the government on a declaration of forfeiture.

The circumstances under which the act of 1862 was passed, the purposes to be accomplished by it, and its scope and effect, are inconsistent with the position assumed by the appellant.

Notwithstanding the favorable terms proposed by Congress, the enterprise languished. The effect of this was the amendatory act of 1864. By it the grant of lands was doubled, a second in lieu of a first mortgage accepted by the government, and a provision inserted that "only one-half of the compensation for services rendered for the government by said companies (meaning this and the auxiliary companies incorporated at the

same time) shall be required to be applied to the payment of the bonds issued by the government in aid of the construction of said road."

This provision was, without doubt, intended merely to modify the original act, so as to allow the government to retain only one-half of such compensation, instead of all. That act applied the whole compensation " to pay the bonds *and interest;* " and it cannot be supposed that Congress intended to relinquish the right thereby secured to make the application in the first place to the interest, and then to the principal. The purpose could have been nothing more than to surrender the right to retain the *whole* of the companies' earnings for services to the government, and to accept, in lieu of it, the right to retain the *half.* This very material change was intended, doubtless, as a substantial favor to the companies; but, on the principle contended for by the appellant, it would be of no value. Of what possible advantage could it be to them to receive one-half of their earnings, if they were subject to a suit to recover it back as soon as it was paid? And this is the effect of the provision, if they are debtors to the government on every semi-annual payment of interest. They could not, in the nature of things, have accepted the stipulation with an understanding that any such effect would be given it. If the government consents to diminish its security, so that only half of the money due for services is to be applied to the payment of the interest or principal, what is to become of the other half? There is no implication that the government shall keep it; and, if not, who is to get it? Assuredly the companies who have earned it.

It is very clear that the Congress of 1864 did not suppose, in making this concession, that it would be barren of results; but, as the rights of the parties have been settled by the construction given to the original provision on this subject, it is unnecessary to consider the question further.

The practice for a series of years was in conformity with the views we have taken of the effect of the charter, until the Secretary of the Treasury withheld the payment of the money earned by the companies for services rendered the government. His action brought the subject to the attention of Congress; and the act of March 3, 1871 (16 Stat., p. 525, sect. 9), was

passed, directing that one-half of the money due the Pacific Railroad companies for services rendered, either "heretofore or hereafter," be paid them, leaving open the question of ultimate right for legal decision.

Another act was subsequently passed, by virtue of which this suit was instituted by the appellee. Act of March 3, 1873, 17 Stat., p. 508, sect. 2. It is contended that this act repeals that portion of the charter of the company which contains the provisions we have discussed. But, manifestly, its purpose was very different. Although it directs the Secretary of the Treasury to withhold all payments to the companies on account of freights and transportation, it at the same time authorizes any company thus affected to bring suit in the Court of Claims for "such freight and transportation;" and in such suit "the right of such company to recover the same upon the law and the facts shall be determined, and also the rights of the United States upon the merits of all the points presented by it in answer thereto by them." This means nothing more or less than the remission to the judicial tribunals of the question, whether this company, and others similarly situated, have the right to recover from the government one-half of what they earned by transportation; and this question is to be determined upon its merits.

The merits of such a question are determined when the effect of the charter is ascertained and declared. It is hardly necessary to say that it would have been idle to authorize a suit, had Congress intended to repeal the provision on which alone it could be maintained.

Counsel have dwelt with special emphasis upon the consequences which would result from a decision adverse to the appellant. We cannot consider them in disposing of the questions arising upon this record. The rights of the parties rest upon a statute of the United States. Its words, as well as its reason, spirit, and intention, leave, in our opinion, no room for doubt as to its true meaning. We cannot sit in judgment upon its wisdom or policy. When we have interpreted its provisions, if Congress has power to enact it, our duty in connection with it is ended.                    *Judgment affirmed.*