Justice BREYER, dissenting.
The International Organizations Immunities Act of 1945 extends to international organizations "the same immunity from suit and every form of judicial process as is enjoyed by foreign governments." 22 U.S.C. § 288a(b). The majority, resting primarily upon the statute's language and canons of interpretation, holds that the statute's reference to "immunity" moves with the times. As a consequence, the statute no longer allows international organizations *773 immunity from lawsuits arising from their commercial activities. In my view, the statute grants international organizations that immunity-just as foreign governments possessed that immunity when Congress enacted the statute in 1945. In reaching this conclusion, I rest more heavily than does the majority upon the statute's history, its context, its purposes, and its consequences. And I write in part to show that, in difficult cases like this one, purpose-based methods of interpretation can often shine a useful light upon opaque statutory language, leading to a result that reflects greater legal coherence and is, as a practical matter, more sound.
I
The general question before us is familiar: Do the words of a statute refer to their subject matter "statically," as it was when the statute was written? Or is their reference to that subject matter "dynamic," changing in scope as the subject matter changes over time? It is hardly surprising, given the thousands of different statutes containing an untold number of different words, that there is no single, universally applicable answer to this question.
Fairly recent cases from this Court make that clear. Compare New Prime Inc. v. Oliveira , 586 U.S. ----, ----, 139 S.Ct. 532, 539, --- L.Ed.2d ---- (2019) (adopting the interpretation of " 'contracts of employment' " that prevailed at the time of the statute's adoption in 1925); Wisconsin Central Ltd . v. United States , 585 U.S. ----, ----, 138 S.Ct. 2067, 2070-2071, 201 L.Ed.2d 490 (2018) (adopting the meaning of " 'money' " that prevailed at the time of the statute's enactment in 1937); Carcieri v. Salazar , 555 U.S. 379, 388, 129 S.Ct. 1058, 172 L.Ed.2d 791 (2009) (interpreting the statutory phrase " 'now under Federal jurisdiction' " to cover only those tribes that were under federal jurisdiction at the time of the statute's adoption in 1934); and Republic of Argentina v. Weltover, Inc. , 504 U.S. 607, 612-613, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (adopting the meaning of " 'commercial' " that was "attached to that term under the restrictive theory" when the Foreign Sovereign Immunities Act was enacted in 1976), with Kimble v. Marvel Entertainment , LLC , 576 U.S. ----, ----, 135 S.Ct. 2401, 2412-2143, 192 L.Ed.2d 463 (2015) (noting that the words " 'restraint of trade' " in the Sherman Act have been interpreted dynamically); West v. Gibson , 527 U.S. 212, 218, 119 S.Ct. 1906, 144 L.Ed.2d 196 (1999) (interpreting the term " 'appropriate' " in Title VII's remedies provision dynamically); and Allied-Bruce Terminix Cos. v. Dobson , 513 U.S. 265, 275-276, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) (interpreting the term " 'involving commerce' " in the Federal Arbitration Act dynamically).
The Court, like petitioners, believes that the language of the statute itself helps significantly to answer the static/dynamic question. See ante , at ---- - ----. I doubt that the language itself helps in this case. Petitioners point to the words "as is" in the phrase that grants the international organizations the "same immunity from suit ... as is enjoyed by foreign governments." Brief for Petitioners 23-24. They invoke the Dictionary Act, which states that "words used in the present tense include the future" "unless the context indicates otherwise." 1 U.S.C. § 1. But that provision creates only a presumption. And it did not even appear in the statute until 1948, after Congress had passed the Immunities Act. Compare § 1, 61 Stat. 633, with § 6, 62 Stat. 859.
More fundamentally, the words "as is enjoyed" do not conclusively tell us when enjoyed. Do they mean "as is enjoyed" at the time of the statute's enactment? Or "as is enjoyed" at the time a plaintiff brings a *774 lawsuit? If the former, international organizations enjoy immunity from lawsuits based upon their commercial activities, for that was the scope of immunity that foreign governments enjoyed in 1945 when the Immunities Act became law. If the latter, international organizations do not enjoy that immunity, for foreign governments can no longer claim immunity from lawsuits based upon certain commercial activities. See 28 U.S.C. § 1605(a)(2).
Linguistics does not answer the temporal question. Nor do our cases, which are not perfectly consistent on the matter. Compare McNeill v. United States , 563 U.S. 816, 821, 131 S.Ct. 2218, 180 L.Ed.2d 35 (2011) (present-tense verb in the Armed Career Criminal Act requires applying the law at the time of previous conviction, not the later time when the Act is applied), with Dole Food Co. v. Patrickson , 538 U.S. 468, 478, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003) (present-tense verb requires applying the law "at the time suit is filed"). The problem is simple: "Without knowing the point in time at which the law speaks, it is impossible to tell what is past and what is present or future." Carr v. United States , 560 U.S. 438, 463, 130 S.Ct. 2229, 176 L.Ed.2d 1152 (2010) (ALITO, J., dissenting). It is purpose , not linguistics, that can help us here.
The words "same ... as," in the phrase "same immunity ... as," provide no greater help. The majority finds support for its dynamic interpretation in the Civil Rights Act of 1866, which gives all citizens the "same right" to make and enforce contracts and to buy and sell property "as is enjoyed by white citizens." 42 U.S.C. §§ 1981(a), 1982 (emphasis added). But it is purpose , not words, that readily resolves any temporal linguistic ambiguity in that statute. The Act's objective, like that of the Fourteenth Amendment itself, was a Nation that treated its citizens equally. Its purpose-revealed by its title, historical context, and other language in the statute-was "to guarantee the then newly freed slaves the same legal rights that other citizens enjoy." CBOCS West, Inc. v. Humphries , 553 U.S. 442, 448, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008). Given this purpose, its dynamic nature is obvious.
Similarly, judges interpreting the words "same ... as" have long resolved ambiguity not by looking at the words alone, but by examining the statute's purpose as well. Compare, e.g. , Kugler's Appeal , 55 Pa. 123, 123-125 (1867) (adopting a dynamic interpretation of "same as" statute in light of "plain" and "manifest" statutory purpose); and Gaston v. Lamkin , 115 Mo. 20, 34, 21 S.W. 1100, 1104 (1893) (adopting a dynamic interpretation of "same as" election statute given the legislature's intent to achieve "simplicity and uniformity in the conduct of elections"), with O'Flynn v. East Rochester , 292 N. Y. 156, 162, 54 N.E.2d 343, 346 (1944) (adopting a static interpretation of "same as" statute given that the legislature "did not contemplate" that subsequent changes to a referenced statute would apply (interpreting N. Y. Gen. Mun. Law Ann. § 360(5) (West 1934))). There is no hard-and-fast rule that the statutory words "as is" or the statutory words "same as" require applying the law as it stands today.
The majority wrongly believes that it can solve the temporal problem by bringing statutory canons into play. It relies on what it calls the "reference canon." That canon, as it appeared more than 75 years ago in Sutherland's book on statutory construction, says that "when a statute refers to a general subject, the statute adopts the law on that subject as it exists whenever a question under the statute arises ." Ante , at ---- (citing 2 J. Sutherland, Statutory Construction §§ 5207-5208 (3d ed. 1943); emphasis added).
*775 But a canon is at most a rule of thumb. Indeed, Sutherland himself says that "[n]o single canon of interpretation can purport to give a certain and unerring answer." 2 Sutherland, supra , § 4501, p. 316. And hornbooks, summarizing case law, have long explained that whether a reference statute adopts the law as it stands on the date of enactment or includes subsequent changes in the law to which it refers is "fundamentally a question of legislative intent and purpose." Fox, Effect of Modification or Repeal of Constitutional or Statutory Provision Adopted by Reference in Another Provision, 168 A. L. R. 627, 628 (1947) ; see also 82 C. J. S., Statutes § 485, p. 637 (2009) ("The question of whether a statute which has adopted another statute by reference will be affected by amendments made to the adopted statute is one of legislative intent and purpose"); id. , at 638 (statute that refers generally to another body of law will ordinarily include subsequent changes in the adopted law only "as far as the changes are consistent with the purpose of the adopting statute").
Thus, all interpretive roads here lead us to the same place, namely, to context, to history, to purpose, and to consequences. Language alone cannot resolve the statute's linguistic ambiguity.
II
"Statutory interpretation," however, "is not a game of blind man's bluff." Dole Food Co. , 538 U.S. at 484, 123 S.Ct. 1655 (BREYER, J., concurring in part and dissenting in part). We are "free to consider statutory language in light of a statute's basic purposes," ibid. , as well as " 'the history of the times when it was passed,' " Leo Sheep Co. v. United States , 440 U.S. 668, 669, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979) (quoting United States v. Union Pacific R. Co. , 91 U.S. 72, 79, 23 L.Ed. 224 (1875) ). In this case, historical context, purpose, and related consequences tell us a great deal about the proper interpretation of the Immunities Act.
Congressional reports explain that Congress, acting in the immediate aftermath of World War II, intended the Immunities Act to serve two related purposes. First, it would "enabl[e] this country to fulfill its commitments in connection with its membership in international organizations." S. Rep. No. 861, 79th Cong., 1st Sess., 3 (1945); see also id. , at 2-3 (explaining that the Immunities Act was "basic legislation" expected to "satisfy in full the requirements of ... international organizations conducting activities in the United States"); H. R. Rep. No. 1203, 79th Cong., 1st Sess., 3 (1945) (similar). And second, it would "facilitate fully the functioning of international organizations in this country." S. Rep. No. 861, at 3.
A
I first examine the international commitments that Congress sought to fulfill. By 1945, the United States had entered into agreements creating several important multilateral organizations, including the United Nations (UN), the International Monetary Fund (IMF), the World Bank, the UN Relief and Rehabilitation Administration (UNRRA), and the Food and Agriculture Organization (FAO). See id. , at 2.
The founding agreements for several of these organizations required member states to grant them broad immunity from suit. The Bretton Woods Agreements, for example, provided that the IMF "shall enjoy immunity from every form of judicial process except to the extent that it expressly waives its immunity." Articles of Agreement of the International Monetary Fund, Art. IX, § 3, Dec. 27, 1945, 60 Stat. 1413, T. I. A. S. No. 1501. UNRRA required members, absent waiver, to accord the organization "the facilities, privileges, *776 immunities, and exemptions which they accord to each other, including ... [i]mmunity from suit and legal process." 2 UNRRA, A Compilation of the Resolutions on Policy: First and Second Sessions of the UNRRA Council, Res. No. 32, p. 51 (1944). And the UN Charter required member states to accord the UN "such privileges and immunities as are necessary for the fulfillment of its purposes." Charter of the United Nations, Art. 105, 59 Stat. 1053, June 26, 1945, T. S. No. 993.
These international organizations expected the United States to provide them with essentially full immunity. And at the time the treaties were written, Congress understood that foreign governments normally enjoyed immunity with respect to their commercial, as well as their noncommercial, activities. Thus, by granting international organizations "the same immunity from suit" that foreign governments enjoyed, Congress expected that international organizations would similarly have immunity in both commercial and noncommercial suits.
More than that, Congress likely recognized that immunity in the commercial area was even more important for many international organizations than it was for most foreign governments. Unlike foreign governments, international organizations are not sovereign entities engaged in a host of different activities. See R. Higgins, Problems & Process: International Law and How We Use It 93 (1994) (organizations do not act with " 'sovereign authority,' " and "to assimilate them to states ... is not correct"). Rather, many organizations (including four of the five I mentioned above) have specific missions that often require them to engage in what U.S. law may well consider to be commercial activities. See infra , at ----.
Nonetheless, under the majority's view, the immunity of many organizations contracted in scope in 1952, when the State Department modified foreign government immunity to exclude commercial activities. Most organizations could not rely on the treaty provisions quoted above to supply the necessary immunity. That is because, unless the treaty provision granting immunity is "self-executing," i.e. , automatically applicable, the immunity will not be effective in U.S. courts until Congress enacts additional legislation to implement it. See Medellin v. Texas , 552 U.S. 491, 504-505, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) ; but see id. , at 546-547, 128 S.Ct. 1346 (BREYER, J., dissenting). And many treaties are not self-executing. Thus, in the ordinary case, not even a treaty can guarantee immunity in cases arising from commercial activities.
The UN provides a good example. As noted, the UN Charter required the United States to grant the UN all "necessary" immunities, but it was not self-executing. In 1946, the UN made clear that it needed absolute immunity from suit, including in lawsuits based upon its commercial activities. See Convention on Privileges and Immunities of the United Nations, Art. II, § 2, Feb. 13, 1946, 21 U.S.T. 1422, T. I. A. S. No. 6900 (entered into force Apr. 29, 1970); see also App. to S. Exec. Rep. No. 9117, p. 14 (1970) ("The U. N.'s immunity from legal process extends to matters arising out its commercial dealings ..."). But, until Congress ratified that comprehensive immunity provision in 1970, no U.S. law provided that immunity but for the Immunities Act. Id. , at 1. Both the UN and the United States found this circumstance satisfactory because they apparently assumed the Immunities Act extended immunity in cases involving both commercial and noncommercial activities: When Congress eventually (in 1970) ratified the UN's comprehensive immunity provision, the Senate reported that the long delay in ratification *777 "appears to have been the result of the executive branch being content to operate under the provisions of the" Immunities Act. Id ., at 2.
In light of this history, how likely is it that Congress, seeking to "satisfy in full the requirements of ... international organizations conducting activities in the United States," S. Rep. No. 861, at 2-3 (emphasis added), would have understood the statute to take from many international organizations with one hand the immunity it had given them with the other? If Congress wished the Act to carry out one of its core purposes-fulfilling the country's international commitments-Congress would not have wanted the statute to change over time, taking on a meaning that would fail to grant not only full, but even partial, immunity to many of those organizations.
B
Congress also intended to facilitate international organizations' ability to pursue their missions in the United States. To illustrate why that purpose is better served by a static interpretation, consider in greater detail the work of the organizations to which Congress wished to provide broad immunity. Put the IMF to the side, for Congress enacted a separate statute providing it with immunity (absent waiver) in all cases. See 22 U.S.C. § 286h. But UNRRA, the World Bank, the FAO, and the UN itself all originally depended upon the Immunities Act for the immunity they sought.
Consider, for example, the mission of UNRRA. The United States and other nations created that organization in 1943, as the end of World War II seemed in sight. Its objective was, in the words of President Roosevelt, to " 'assure a fair distribution of available supplies among' " those liberated in World War II, and " 'to ward off death by starvation or exposure among these peoples.' " 1 G. Woodbridge, UNRRA: The History of the United Nations Relief and Rehabilitation Administration 3 (1950). By the time Congress passed the Immunities Act in 1945, UNRRA had obtained and shipped billions of pounds of food, clothing, and other relief supplies to children freed from Nazi concentration camps and to others in serious need. 3 id. , at 429; see generally L. Nicholas, Cruel World: The Children of Europe in the Nazi Web 442-513 (2005).
These activities involved contracts, often made in the United States, for transportation and for numerous commercial goods. See B. Shephard, The Long Road Home: The Aftermath of the Second World War 54, 57-58 (2012). Indeed, the United States conditioned its participation on UNRRA's spending what amounted to 67% of its budget on purchases of goods and services in the United States. Id. , at 57-58; see also Sawyer, Achievements of UNRRA as an International Health Organization, 37 Am. J. Pub. Health 41, 57 (1947) (describing UNRRA training programs for foreign doctors within the United States, which presumably required entering into contracts); International Refugee Org. v. Republic S. S. Corp. , 189 F.2d 858, 860 (CA4 1951) (describing successor organization's transportation of displaced persons, presumably also under contract). Would Congress, believing that it had provided the absolute immunity that UNRRA sought and expected, also have intended that the statute be interpreted "dynamically," thereby removing most of the immunity that it had then provided-not only potentially from UNRRA itself but also from other future international organizations with UNRRA-like objectives and tasks?
C
This history makes clear that Congress enacted the Immunities Act as part of an *778 effort to encourage international organizations to locate their headquarters and carry on their missions in the United States. It also makes clear that Congress intended to enact "basic legislation" that would fulfill its broad immunity-based commitments to the UN, UNRRA, and other nascent organizations. S. Rep. No. 861, at 2. And those commitments, of necessity, included immunity from suit in commercial areas, since organizations were buying goods and making contracts in the United States.
To achieve these purposes, Congress enacted legislation that granted necessarily broad immunity. And that fact strongly suggests that Congress would not have wanted the statute to reduce significantly the scope of immunity that international organizations enjoyed, particularly organizations engaged in development finance, refugee assistance, or other tasks that U.S. law could well decide were "commercial" in nature. See infra , at ----.
To that extent, an examination of the statute's purpose supports a static, not a dynamic, interpretation of its cross-reference to the immunity of foreign governments. Unlike the purpose of the Civil Rights Act, the purpose here was not to ensure parity of treatment for international organizations and foreign governments. Instead, as the Court of Appeals for the D. C. Circuit pointed out years ago, the statute's reference to the immunities of "foreign governments" was a "shorthand" for the immunities those foreign governments enjoyed at the time the Act was passed. Atkinson v. Inter-American Development Bank , 156 F.3d 1335, 1340, 1341 (1998).
III
Now consider the consequences that the majority's reading of the statute will likely produce-consequences that run counter to the statute's basic purposes. Although the UN itself is no longer dependent upon the Immunities Act, many other organizations, such as the FAO and several multilateral development banks, continue to rely upon that Act to secure immunity, for the United States has never ratified treaties nor enacted statutes that might extend the necessary immunity, commercial and noncommercial alike.
A
The "commercial activity" exception to the sovereign immunity of foreign nations is broad. We have said that a foreign state engages in "commercial activity" when it exercises " 'powers that can also be exercised by private citizens.' " Republic of Argentina , 504 U.S. at 614, 112 S.Ct. 2160. Thus, "a contract to buy army boots or even bullets is a 'commercial' activity," even if the government enters into the contract to "fulfil[l] uniquely sovereign objectives." Ibid. ; see also H. R. Rep. No. 94-1487, p. 16 (1976) ("[A] transaction to obtain goods or services from private parties would not lose its otherwise commercial character because it was entered into in connection with an [Agency for International Development] program").
As a result of the majority's interpretation, many of the international organizations to which the United States belongs will discover that they are now exposed to civil lawsuits based on their (U.S.-law-defined) commercial activity. And because "commercial activity" may well have a broad definition, today's holding will at the very least create uncertainty for organizations involved in finance, such as the World Bank, the Inter-American Development Bank, and the Multilateral Investment Guarantee Agency. The core functions of these organizations are at least arguably "commercial" in nature; the organizations exist to promote international development by investing in foreign companies and projects across the world. See *779 Brief for International Bank for Reconstruction and Development et al. as Amici Curiae 1-4; Brief for Member Countries and the Multilateral Investment Guarantee Agency as Amici Curiae 13-15. The World Bank, for example, encourages development either by guaranteeing private loans or by providing financing from its own funds if private capital is not available. See Articles of Agreement of the International Bank for Reconstruction and Development, Art. I, Dec. 27, 1945, 60 Stat. 1440, T. I. A. S. No. 1502.
Some of these organizations, including the International Finance Corporation (IFC), themselves believe they do not need broad immunity in commercial areas, and they have waived it. See, e.g. , Articles of Agreement of the International Finance Corporation, Art. 6, § 3, Dec. 5, 1955, 7 U.S.T. 2214, 264 U. N. T. S. 118 (implemented by 22 U.S.C. § 282g ); see also 860 F.3d 703, 706 (CADC 2017). But today's decision will affect them nonetheless. That is because courts have long interpreted their waivers in a manner that protects their core objectives. See, e.g. , Mendaro v. World Bank , 717 F.2d 610, 614-615 (CADC 1983). (This very case provides a good example. The D. C. Circuit held below that the IFC's waiver provision does not cover petitioners' claims because they "threaten the [ IFC's] policy discretion." See 860 F.3d at 708.) But today's decision exposes these organizations to potential liability in all cases arising from their commercial activities, without regard to the scope of their waivers.
Under the majority's interpretation, that broad exposure to liability is at least a reasonable possibility. And that being so, the interpretation undercuts Congress' original objectives and the expectations that it had when it enacted the Immunities Act in 1945.
B
The majority's opinion will have a further important consequence-one that more clearly contradicts the statute's objectives and overall scheme. It concerns the important goal of weeding out lawsuits that are likely bad or harmful-those likely to produce rules of law that interfere with an international organization's public interest tasks.
To understand its importance, consider again that international organizations, unlike foreign nations, are multilateral, with members from many different nations. See H. R. Rep. No. 1203, at 1. That multilateralism is threatened if one nation alone, through application of its own liability rules (by nonexpert judges), can shape the policy choices or actions that an international organization believes it must take or refrain from taking. Yet that is the effect of the majority's interpretation. By restricting the immunity that international organizations enjoy, it "opens the door to divided decisions of the courts of different member states," including U.S. courts, "passing judgment on the rules, regulations, and decisions of the international bodies." Broadbent v. Organization of Am. States , 628 F.2d 27, 35 (CADC 1980) ; cf. Singer, Jurisdictional Immunity of International Organizations: Human Rights and Functional Necessity Concerns, 36 Va. J. Int'l L. 53, 63-64 (1995) (recognizing that "[i]t would be inappropriate for municipal courts to cut deep into the region of autonomous decision-making authority of institutions such as the World Bank").
Many international organizations, fully aware of their moral (if not legal) obligations to prevent harm to others and to compensate individuals when they do cause harm, have sought to fulfill those obligations without compromising their ability to operate effectively. Some, as I have said, waive their immunity in U.S. courts *780 at least in part. And the D. C. Circuit, for nearly 40 years, has interpreted those waivers in a way that protects the organization against interference by any single state. See, e.g. , Mendaro , 717 F.2d at 615. The D. C. Circuit allows a lawsuit to proceed when "insistence on immunity would actually prevent or hinder the organization from conducting its activities." Id. , at 617. Thus, a direct beneficiary of a World Bank loan can generally sue the Bank, because "the commercial reliability of the Bank's direct loans ... would be significantly vitiated" if "beneficiaries were required to accept the Bank's obligations without recourse to judicial process." Id. , at 618. Where, however, allowing a suit would lead to "disruptive interference" with the organization's functions, the waiver does not apply. Ibid.
Other organizations have attempted to solve the liability/immunity problem by turning to multilateral, not single-nation, solutions. The UN, for instance, has agreed to "make provisions for appropriate modes of settlement of ... [d]isputes arising out of contracts or other disputes of a private law character." Convention on Privileges and Immunities of the United Nations, Art. VIII, § 29, 21 U.S.T. 1438, T. I. A. S. No. 6900. It generally does so by agreeing to submit commercial disputes to arbitration. See Restatement (Third) of Foreign Relations Law of the United States § 467, Reporters' Note 7 (1987). Other organizations, including the IFC, have set up alternative accountability schemes to resolve disputes that might otherwise end up in court. See World Bank, Inspection Panel: About Us (describing World Bank's three-member "independent complaints mechanism" for those "who believe that they have been ... adversely affected by a World Bank-funded project"), https://inspectionpanel.org/about-us/about-inspection-panel (as last visited Feb. 25, 2019); Compliance Advisor Ombudsman, How We Work: CAO Dispute Resolution (describing IFC and Multilateral Investment Guarantee Agency dispute-resolution process, the main objective of which is to help resolve issues raised about the "social and environmental impacts of IFC/MIGA projects"), www.cao-ombudsman.org/howwework/ombudsman.
These alternatives may sometimes prove inadequate. And, if so, the Immunities Act itself offers a way for America's Executive Branch to set aside an organization's immunity and to allow a lawsuit to proceed in U.S. courts. The Act grants to the President the authority to "withhold," to "withdraw," to "condition," or to "limit" any of the Act's "immunities" in "light of the functions performed by any such international organization." 22 U.S.C. § 288.
Were we to interpret the statute statically, then, the default rule would be immunity in suits arising from an organization's commercial activities. But the Executive Branch would have the power to withdraw immunity where immunity is not warranted, as the Act itself provides. And in making that determination, it could consider whether allowing the lawsuit would jeopardize the organization's ability to carry out its public interest tasks. In a word, the Executive Branch, under a static interpretation, would have the authority needed to separate lawsuit sheep from lawsuit goats.
Under the majority's interpretation, by contrast, there is no such flexibility. The Executive does not have the power to tailor immunity by taking into account the risk of a lawsuit's unjustified interference with institutional objectives or other institutional needs. Rather, the majority's holding takes away an international organization's immunity (in cases arising from "commercial" activities) across the board. And without a new statute, there is no way *781 to restore it, in whole or in part. Nothing in the present statute gives the Executive, the courts, or the organization the power to restore immunity, or to tailor any resulting potential liability, where a lawsuit threatens seriously to interfere with an organization's legitimate needs and goals.
Thus, the static interpretation comes equipped with flexibility. It comes equipped with a means to withdraw immunity where justified. But the dynamic interpretation freezes potential liability into law. It withdraws immunity automatically and irretrievably, irrespective of institutional harm. It seems highly unlikely that Congress would have wanted this result.
* * *
At the end of World War II, many in this Nation saw international cooperation through international organization as one way both to diminish the risk of conflict and to promote economic development and commercial prosperity. Congress at that time and at the request of many of those organizations enacted the Immunities Act. Given the differences between international organizations and nation states, along with the Act's purposes and the risk of untoward consequences, I would leave the Immunities Act where we found it-as providing for immunity in both commercial and noncommercial suits.
My decision rests primarily not upon linguistic analysis, but upon basic statutory purposes. Linguistic methods alone, however artfully employed, too often can be used to justify opposite conclusions. Purposes, derived from context, informed by history, and tested by recognition of related consequences, will more often lead us to legally sound, workable interpretations-as they have consistently done in the past. These methods of interpretation can help voters hold officials accountable for their decisions and permit citizens of our diverse democracy to live together productively and in peace-basic objectives in America of the rule of law itself.
With respect, I dissent.