Richardson, Ch. J.,
delivered the opinion of the court:
The claimant’s railroad is composed of three divisions:
1. The Union Pacific Division, originally incorporated under the Act of July 2, 1862 (12 Stat. L., 489, ch. 120), amended by the Act of July 2, 1864 (13 Stat. L., 356), from Council Bluffs to Ogden. This division-was aided by the United States by bonds for each mile of the road.
2. The Kansas Pacific Division, extending from Kansas City to Denver, was aided by the United States by'bonds for each of 393^f miles, and not aided for the remaining 245f miles.
3. The Denver Pacific Division, extending from Denver to Cheyenne, and that division was not aided by the United States.
The act of 1862, section 6, required the company to perform transportation for the government at fair and reasonable rates of compensation, not exceeding the amounts paid by private parties for the same kind of service; that all compensation for such services should be applied to the payment of the bonds which it had received from the defendants, with interest until the whole amount should be fully paid; and that after the road should be completed and until the bonds and interest were paid at least 5 per centum of the net earnings of the road should be annually applied to the payment thereof.
By the act of 1864, section 5, only one-half of the compensation for services rendered to the government by the company was required to be applied to the payment of the bonds issued ■by the defendants to aid in the construction of the road.
The Act of mS, May 7, ch. 96 (20 St. L., 56), commonly called the Thurman Act, requires the whole amount of compensation -due from the government after June 30,1878, to be retained by the defendants, and makes some other provisions hereafter mentioned.
These provisions apply not only to the Union Pacific Division, but also to the 293|f miles of the Kansas Pacific Division which were aided by the government. They do not apply to the other 245-^ miles of said road, nor to the Denver Pacific Division.
The claimant brings this action to recover the whole compensation for services rendered to the government over the non- *103 aided Denver Pacific Division and the Don-aided portion of the Kansas Pacific Division to December 31, 1882, and one-half of the compensation for services rendered to the government over the Union Pacific Division and the aided x>ortions of the Kansas Pacific Division to June 30,1878, when the provisions of the Thurman Act took effect.
In this branch of the case the principal controversy was as to amount of compensation to which the claimant was entitled for carrying the mails over the aided portions of its road under the act of 1862. The Treasury Department, in making up the account for carrying the mails, has allowed to the claimant the maximum rates established by law for the same kind of service by non-aided railroads, less the deduction made and fines imposed by the Postmaster-General. The claimant demands a much greater rate and the Assistant Attorney-General contends for a much less rate.
The court has found as a fact that the rates allowed by the Treasury Department are fair and reasonable, and not in excess of the rates paid by private parties for the same kind of service. No question of law arises upon that finding.
There are, however, two questions of law involved in this branch of the case:
1. The claimant has arrangements with the companies of connecting roads by which said companies sell through passenger tickets at reduced rates from New York, San Francisco, and other places over their own and the claimant’s road, and pay to the claimant, as its proportion of the through fare between Council Bluffs and Ogden, $54 each. All passengers buying tickets at Council Bluffs or Ogden and taking passage over the claimant’s road between those places are charged $78.50. This rate is claimed by the company for every passenger taking passage in like manner at either of those places and traveling for and at the expense of the government over its road, and not having purchased a through ticket from other places on other railroads, or not having a requisition showing that he was traveling over such other roads in connection with the claimant’s road.
The court has found that $78.50 is a fair and reasonable compensation for the transportation of a passenger purchasing a ticket at Council Bluffs or Ogden and traveling over the road between those places, and, so far as it is a question of fact, that *104 it is not in excess of tile rate paid by private parties for the same kind of service. The question now is, as a matter of law, if it be a question of law, whether the defendants are bound to pay $78.50 or only $54 for each of their passengers so transported. The Treasury Department have allowed only the latter sum.
In our opinion the defendants are bound to pay the same rate for each of its passengers so transported as is paid by private parties taking the train in like manner at the same places and traveling over the same parts of its road, that being found to be a fair and reasonable compensation; and that when these passengers do not purchase through tickets, and do not have requisitions showing that they are traveling over other roads in connection with the claimant’s road, but travel as local passengers, the defendants cannot have them transported at the same rates as the company receives in its division with other companies for the transportation on through tickets over its own and other roads.
2. The claimant’s uniform rate for the transportation of a passenger between Council Bluffs and Omaha, a distance of 3.97 miles, over its bridge and approaches, was 50 cents during the time involved in this branch of the case. The court has found as a fact that 50 cents for each of the passengers traveling at the expense of the United States was a fair and reasonable compensation, and not in excess of the rate paid by private parties for the same kind of service.
But the Treasury Department has allowed in its accounts much less rates, not uniform, but varying according to the rate per mile paid by the passenger over the connecting road by which he reached the claimant’s road. This latter rate was different over different roads and different over the same road, according to the distance traveled thereon. This, it is urged on the part of the defendants, they have a right to do, by reason of the provisions of the Act of February 24, 1871, chap. 67 (16 Stat. L., 430), the privileges of which the claimant has availed itself of by building its bridge and issuing its bonds in accordance therewith, and which provides that—
“ Said bridge may be so constructed as to provide for the passage of ordinary vehicles and travel, and said company may levy and collect tolls and charges for the use of the same; and for the use and protection of said bridge and property the *105 Union Pacific Bailway Company shall be empowered, governed, and limited by the provisions of the act entitled ‘An act to authorize the construction of certain bridges and to establish them as post-roads,’ approved July twenty-five, eighteen hundred and sixty-sis, so far as the same is applicable thereto.”
The act thus referred to is chapter 24G of 1866 (14 Stat. L., 245), of which section 3 is as follows:
“ Any bridge constructed under this act, and according to its limitation, shall be a lawful structure, and shall be recognized and known as a post-route, upon which, also, no higher charge shall be made for the transportation over the same of the mails, the troops, and the munitions of war of the United States, than the rate per mile paid for the transportation over the railroads or public highways leading to the said bridge.”
In our opinion the words “for the use and protection of said bridge and property” in the act of 1871, to which any bridge built under its provisions was made subject to the act of 1866, do not apply to the rates of compensation to be paid by the defendants for the transportation of their passengers between Council Bluffs and Omaha, a distance of 3.97 miles, over the claimant’s road, within which this bridge is constructed.
In the case of the Union Pacific Railroad Company v. Hall et al. (91 U. S. R., 343) the SupremeCourt decided that the bridge constructed by the company between Omaha and Council Bluffs became part of its road, and that it was bound to run and operate the whole road, including the bridge, as one connected and continuous line.
When the bridge was built it became subject to the act of 1862, wherein it was provided that transportation for the government should be at fair and reasonable rates and not in excess of those paid by private parties for the same kind of service. We do not think that Congress intended by the act of 1871 to supersede or modify this provision as to any part of the claimant’s road.
This disposes of all the controverted questions arising on the causes of action set out by the claimant. The conclusion, therefore, is that the claimant is entitled to recover for all the services performed by it for the defendants over the Denver Pacific Division and its branches (set out in findings v, vi, and vii), and over the non-aided portion of the Kansas Pacific Division to December 31, 1882; also one-half for its services over the aided part of said Kansas Pacific Division and over the Union Pacific Division, aggregating $2,910,124.08.
*106 The defendants have filed a set-off and counter-claim to recover of the claimant, under the act of 1862, 5 per cent, of the net earning's of the aided part of the Kansas Pacific Division from November 2, 1868, to December 31, 1882, and 5 per cent, of the net earnings of the Union Pacific Division from November 6, 1875, to June 30,1878, when the Thurman Act took effect and made additional provisions on the subject of payments by the company.
On this branch of the case the only controversy was as to the compensation to be allowed and computed as part of the gross earnings for carrying the mails. This the court has found to be the same as allowed by the Treasury Department.
There was formerly a controversy between the parties as to whether certain items of expenditure, partly in the nature of permanent improvements, should be deducted from the gross earnings in determiningthe net earnings, upon which the 5 per cent, was to be calculated. But that controversy was terminated as to earnings before the passage of the Thurman Act, by the decision of the Supreme Court in Union Pacific Railroad Company v. United States (99 U. S. R., 402), and we have followed that decision in all its parts in findiug the facts in that part of these cases.
The defendants set up further counter-claims to recover, under the act of 1862,5 per cent, of the net earnings of the Union Pacific Division from June 30,1878, to December 31,1882, and so much of $850,000 each year as, with said 5 per cent; and the whole compensation for services for the government, will with said two items equal 25 per cent, of the net earnings, under the requirements of section 1 of the Thurman Act of May 7, 1878 (ch. 96, 20 Stat. L., 56).
In addition to the controversy as to the compensation to be allowed for carrying the mails which is settled by the findings of fact, a question of law is involved as to whether or not certain items of expenditure, partly in the nature of permanent improvements (set out in Schedule D), shall be deducted from the gross earnings in determining the net earnings under the language of the Thurman Act.
In the case of the Union Pacific Railroad Company v. United States (99 U. S. R., 402), above cited, the Supreme Court decided that, under the act of 1862, in determining the net earnings there was to be deducted from the gross earnings expendí- *107 tures which the company had actually paid out of its earnings for the following objects:
1. Station buildings; 2. Shops and fixtures; 3. Equipment; 4. Government commissioners; 5. Fencing; 6. Snow sheds and fences; 7. Express outfit; 8. Engineering;.9. Bridging; 10. Car shops and sheds; 11. Roadway and track; 12. Hotels; 13. Tenements; 14. Coal sheds; 15. Omaha depot buildings; 16. Omaha general offices; 17. Real estate; 18. Laramie rolling mill; 19. Water-works.
Between July 1,1878, and December 31,1882, the company paid out of its earnings the sum of $2,763,670.64 for equipment and improvements of one or another description specified in those nineteen items, as shown by Exhibit D, and it claims a legal right, in ascertaining its net earnings during that period, to deduct that amount from its gross earnings during the same period.
If the Act of May 7, 1878 (20 Stat. L., 56, ch. 96), commonly called the Thurman Act, had not been passed, the Supreme Court’s decision would be conclusive in favor of the company’s claim to that deduction; but it is contended for the government that a different rule is prescribed by that act. Whether this is so or not is the question we are required to decide.
Section 1 of the Thurman Act reads as follows:
“ That the net earnings mentioned in said act of eighteen hundred and sixty-two, of said railroad companies respectively, shall be ascertained by deducting from the gross amount of their earnings respectively the necessary expenses actually paid within the year in operating the same and keeping the same in a state of repair, and also the sum paid by them respectively within the year in discharge of interest on their first-mortgage bonds, whose lien has priority over the lien of the United States, and excluding from consideration all sums owing or paid by said companies respectively for interest upon any other portion of their indebtedness; and the foregoing provision shall be deemed and taken as an amendment of said act of eighteen hundred and sixty-four, as well as of said act of eighteen hundred and sixty-two. This section shall take effect on the thirtieth day of June next, and be applicable to all computations of net earnings thereafter; but it shall not affect any right of the United States or of either of said railroad companies existing prior thereto.”
The question growing out of this provision is mainly connected with the use of the word “ necessary ” along with the words “expenses actually paid * * * in operating” the *108 road. Tbe company claims that the expenses embraced in the aforesaid sum of $2,763,670.04 were necessary within the meaning of the ’ statute ; the government contends that they were not.
Were the word “necessary” omitted, it could not, we think, be justly questioned that the ruling of the Supreme Court would directly apply to and fully sustain the company’s position. Does the insertion of that word change the aspect of the case in this regard? In answering this question we must, of course, endeavor to get at the meaning of the word in that connection.
In McCulloch v. Maryland, (4 Wheaton, 316), Chief-Justice Marshall, in delivering the opinion of the Supreme Court on one of the gravest questions of constitutional law ever brought before that tribunal, considered the meaning of the word in that clause of the Constitution which gives Congress the power “ to make all laws which shall be necessary and proper for carrying into effect the foregoing powers, and all other powers vested by this Constitution in the government of the United States; ” and in discussing that meaning he used language which we consider fairly applicable here.
The position taken in the argument of that case, and which the court deemed it necessary to meet, was that the word “necessary ” limited the right to pass laws for the execution of the granted powers to such as are indispensable and without which the power would be nugatory. This is substantially the claim of the government in the present case in construing the Thurman Act. If we sustain it we can allow the company only, first, expenses of repair; and, secondly, expenses indispensable to the mere operating of the road as a highway of traffic, without permitting it to meet out of its earnings the growing demands of an ever-increasing business, and so keep itself ready and able to respond efficiently to those demands.
The Supreme Court expounded the meaning of the contested word as follows:
“ Is it true that this is the sense in which the word necessary’ is always used? Does it always import an absolute physical necessity, so strong that one thing to which another may be termed necessary cannot exist without that other? We think it does not. If reference be had to its.use in the common affairs of the world or in approved authors, we find that it frequently imports no more than that one thing is con *109 venient, or useful, or essential to another. To employ the means necessary to an end is generally understood as employing any means calculated to produce the end, and not as being-confined to those single means, without which the end would be entirely unattainable. Such is the character of human language that no word conveys to the mind in all situations one single definite idea; and nothing is more common than to use words in a figurative sense. Almost all compositions contain words which taken in their rigorous sense would convey a meaning different from that which is obviously intended. It is essential to just construction that many words which import something excessive should be understood in a more mitigated sense — in that sense which common usage justifies. The word ‘necessary’ is of this description. It has not a fixed character peculiar to itself. It admits of all degrees of comparison, and is often connected with other words which increase or diminish the impression the mind receives of the urgency it imports. A thing may be necessary, very necessary, absolutely or indispensably necessary. To no mind would the same idea be conveyed by these several phrases. * * * This word, then, like others, is used in various senses; and in its construction the subject, the context, the intention of the person using them, are all to be taken into view.”
.And again, in The Legal Tender Case (110 U. S. R., 421-440) the Supreme Court said, in reference to the same words in the Constitution:
“ By the settled construction and the only reasonable interpretation of this clause, the words ‘ necessary and proper’ are not limited to such measures as are absolutely and indispensably necessary, without which the powers granted must fail of execution; hut they include all appropriate means which are conducive or adapted to the end to he accomplished, and which, in the judgment of Congress, will most advantageously effect it.”
In the light of these expressions, we feel quite justified in . considering the word “ necessary ” in the Thurman Act untrammeled by any rigorous obligation to impose on it a severely restrictive sense.
The Union Pacific Railroad, in the words of the Supreme Court, “ was a national work, originating in national necessities, and requiring national assistance. * * * Although this road was a military necessity, there were other reasons active at the time in producing an opinion for its completion besides the protection of an exposed frontier. There was a vast unpeopled territory lying between the Missouri and Sacramento Rivers, which was practically worthless without the *110 facilities afforded by a railroad for the transportation of persons and property. With its construction the agricultural and mineral resources of this territory could be developed, settlements made where settlements were possible, and thereby the wealth and power of the United States largely increased; and there was also the pressing want, in time of peace even, of an improved and cheaper method for the transportation of the mails, and of supplies for the Army and the Indians. It was in the presence of these facts that Congress undertook to deal with the subject of this railroad.” (United States v. Union Pacific R. R. Co., 91 U. S. R., 72.)
We cannot lose sight of these views in the consideration of the present controversy without doing probable injustice to both the legislature and the company. We cannot regard this subject in a cramped or jealous spirit; nor, on the other hand, can we treat it in a spirit of inconsiderate liberality. Our inquiry is, what may the intention of Congress be fairly considered to have been in the use of the words “ necessary expenses in * * * operating” the road ?
The answer to this involves, also, the meaning to be ascribed to the word “ operating.”
In its restricted sense it might be confined to the mere running of trains over the road, and the ordinary incidents thereof; but we do not feel bound so to limit it. We think it was intended by the legislature to be understood in its larger and more comprehensive sense of fully performing the greater work which the road was intended to do, in promoting the reclaiming, peopling, and developing of a vast unpeopled territory * * * which was practically worthless without the facilities afforded by a railroad for the transportation of persons and property.”
However viewed, it was quite certain, in the light of all experience, that there would be a growth in the business of this road. It was not supposable that its traffic would remain stationary for any length of time. As settlements were made'along the line, its business would increase; in what ratio time alone could determine. Is it reasonable to suppose that this was not foreseen by Congress'? And if foreseen, is it fair to assume that that body intended to enact provisions which would obstruct the efforts of the company to meet the increase We think not. On the contrary, we are led to the opposite conclu *111 sion. It seems to us clear that when, in the Thurman Act, that body used the terms “ necessary expenses * * * of operating” the road, it referred to the expenses of operating it, in all respects, pari passu with all the fair and legitimate demands of the business coming to it; and that the word "necessary ” was not meant in its most stringent and restrictive import, but in the sense of limiting the company to such expenses as were bona fide conducive or adapted to that end, and to exclude those which were not. And this leads us to the ultimate conclusion that those words in the Thurman Act do not in reality make a rule different from that indicated by the Supreme Court in 99 U. S. R., 402. The outlays which were there approved included all kinds of expenditures which the company now claims a right to deduct from its gross earnings in the process of ascertaining the amount of its net earnings. Hence, in our opinion, the company is just as much entitled to deduct them now as it would be if that act had not been passed.
Therefore, our judgment is that the company is entitled, in ascertaining the net earnings between July 1, 1878, and December 31, 1882, to deduct from the gross earnings of that period the sum of $2,763,670.64 on account of the items set out in Schedule D and actually paid by it out of earnings for equipment and improvements, and in the computation of the net earnings the court has included all those items in necessary expenses of operating and keeping the road in repair.
Another question of law is raised on the construction of that part of the Thurman Act which requires the company to pay certain money into the Treasury of the United States.
Section 2 requires one-half of the whole amount of compensation which may, from time to time, be due to. the Union Pacific Railroad Company, for services rendered to the government, returned by the defendants, to be turned into the sinking fund thereinafter provided, for the uses therein mentioned; and section 3 of the act establishes and regulates that fund.
Section 4 provides as follows :
“ That there shall be carried to the credit of the said fund, 'on the first day of February in each year, the one-half of the compensation for services hereinbefore named, rendered for the government by said Union Pacific Railroad Company, hot applied in liquidation of interest; and, in addition thereto, the said company shall, on said day in each year, pay into the Treasury, to the credit of said sinking fund, the sum of eight *112 hundred and fifty thousand dollars, or so much thereof as shall be necessary to make the five per centum of the net earnings of its said road payable to the United States under said act of eighteen hundred and sixty-two, and the whole sum earned by it as compensation for services rendered for the United States, together with the sum by this section required to be paid, amount in the aggregate to twenty-five per centum of the whole net earnings of said railroad company, ascertained and defined as hereinbefore provided, for the year ending on the thirty-first day of December next preceding.”
We do not feel called to enter on an extended discussion of the section, but will state in brief terms our view of it.
It seems quite clear to us that the purpose of that act was not to alter the provision of the act of 1862 requiring 5 per cent, of the net earnings to be paid into the Treasury, but to add thereto so much of $850,000 each year as with said 5 per cent, and the whole compensation for services performed for the government should equal 25 per cent, of its net earnings, and no more.
In accordance with these views the defendants are entitled to recover on their counter-claim, as set out in findings xii and xiii, the sum of $4,487,807.39 •, deducting the amount recoverable by the claimant, $2,910,124.08, leaves a balance in favor of the defendants of $1,577,683.31 for the purposes set forth in the acts of 1862, 1864, and 1878.
On the whole case the judgment of the court is that the defendants are entitled to judgment against the claimants for that difference, and it will be so entered of record.
Note. — Chief Justice Drake was present at the trial and determination of this case, concurred in the findings of fact and conclusions of law adopted by the court, and was engaged in the preparation of the opinion thereon when he availed himself of the benefit of section 714 of the Be vised Statutes by resigning his office, January 12,1885, in the seventy-fourth year of his age and the fifteenth of his service as Chief Justice. So much of the foregoing opinion as refers to the matter of the ascertainment of the net earnings of the road was prepared by him. He took no part in any case subsequent to this.
Nott, J., being an executor of an estate which held some of the stock of the claimant’s company, took no part in the decision.