## UNITED STATES v. THE SADIE et al.

*(Circuit Court, S. D. New York. February 11, 1890.)*

1. HARBORS—FILLING UP—CONSTRUCTION OF STATUTE.
    Act Cong. June 29, 1888, § 1, forbids the depositing of any refuse mud, sand, or dredgings in the tidal waters of the harbor of New York, or its adjacent or tributary waters, or in those of Long Island sound, within limits prescribed by the supervisor of the harbor, and a penalty is prescribed therefor. *Held,* that the depositing of such refuse mud or sand in the channel of the Hudson river at a point 60 miles from the harbor is a violation of the provisions of the act, and punishable thereunder.

2. SAME.
    An officer designated to act as such supervisor, according to the provisions of such act, issued an order providing that the deposits of refuse mud, sand, and dredging must take place east of a certain meridian of longitude, and south of a certain parallel of latitude. *Held,* that this order prescribed the limits within which such matter might be deposited, within the meaning of the statute.

Appeal from a Decree of the District Court sustaining exceptions to and dismissing a libel filed under act of June 29, 1888.

On June 29, 1888, congress passed an act entitled "An act to prevent obstructive and injurious deposits within the harbor and adjacent waters of New York city, by dumping or otherwise, and to punish and prevent such offenses." The first section thereof provides as follows:

"The placing, discharging, or depositing, by any process or in any manner, of refuse, dirt, ashes, cinders, mud, sand, dredgings, sludge acid, or any other matter of any kind, other than that flowing from streets, sewers, and passing therefrom in a liquid state, in the tidal waters of the harbor of New York, or its adjacent or tributary waters, or in those of Long Island sound, within the limits which shall be prescribed by the supervisor of the harbor, is hereby strictly forbidden; and every such act is made a misdemeanor, and every person engaged in, or who shall aid, abet, authorize, or instigate, a violation of this section, shall, upon conviction, be punishable by fine or imprisonment."

By the second section every master and engineer, or person or persons acting in such capacity, respectively, on board any boat or vessel, who shall knowingly engage in towing any scow, boat, or vessel loaded with any such prohibited matter, to any point or place of deposit or discharge in the waters of the harbor of New York, or in its adjacent or tributary waters, or in those of Long Island sound, or to any point or place elsewhere than within the limits defined and permitted by the supervisor of the harbor hereinafter mentioned, shall be deemed guilty of a violation of the act, and upon conviction punished as provided in section 1. Section 3 provides that in all cases of receiving on board of any scows or boats such forbidden matter or substance as herein described it shall be the duty of the owner or master, or person acting in such capacity, before proceeding to take or tow the same to the place of deposit, to obtain a permit from the supervisor of the harbor, defining the precise limits of

the discharge. Any deviation from the terms of such permit by owner, master, or engineer of such scows, or of the boats that tow them, is made "a misdemeanor, within the meaning of the act." Section 4 provides for the disposition of mud, dirt, dredgings, etc., taken, dredged, etc., from any slip, basin, or shoal in the harbor of New York, or waters adjacent or tributary thereto, and placed on any boat, scow, etc., for the purpose of being taken or towed upon the waters of the harbor of New York to a place of deposit. It requires that the same shall be deposited and discharged at such place or within such limits as shall be defined and specified by the supervisor of the harbor, as prescribed in the third section, to-wit, by the special permit therein provided for, and prescribes a penalty for the violation of its provisions. The fourth section also provides that "any boat or vessel used or employed in violating any provision of this act shall be liable to the pecuniary penalties imposed thereby, and may be proceeded against summarily, by way of libel, in any district court of the United States having jurisdiction thereof." By the next section it is provided that a line officer of the navy shall be designated to act as supervisor of the harbor. Such officer, having been designated, published the following:

"OFFICE OF THE SUPERVISOR OF THE HARBOR OF NEW YORK, U. S. ARMY BUILDING, 39 WHITEHALL STREET, NEW YORK CITY.

"By virtue of the authority vested in me as supervisor of the harbor of New York, the following limits for the deposit of material are prescribed, as provided in the first section of the foregoing act: The deposit of refuse, dirt, ashes, cinders, mud, sand, dredgings, sludge acid, or matter of any kind, other than that flowing from streets or sewers, and passing therefrom in a liquid state, must take place east of the meridian 73° 55′ 56″ W., (which passes through the Scotland light-ship,) and south of parallel 40° 31′ N. When stone, earth, sand, ashes, or other inoffensive material are required to fill bulk-heads, reclaim land, or any material can be properly disposed of, at points other than those designated, special permits may be granted. Violations of the foregoing act can be reported to this office, where information relating to the movement and deposit of material will be furnished.
                    "JACOB J. HUNKER, Lieutenant U. S. Navy, Supervisor."

On or about December 2, 1889, as alleged in the libel, the steam-tug Sadie was used and employed in towing from the basin or shoal at the Pennsylvania coal docks at Newburgh, N. Y., to the channel of the North (or Hudson) river, opposite Newburgh, certain scows, boats, and vessels containing a large quantity of mud and other matter, (not sewage or in a liquid state,) and there dumped and discharged the same. Newburgh is situated on the Hudson river, about 60 miles from New York. The tide rises and falls in such river up to the state dam at Troy, about 90 miles above Newburgh. Complaint being made, the district attorney libeled the tug in the district court. The libel contained four causes of action, (or more properly four counts,) successively setting forth violations of the first, second, third, and fourth sections, and claiming separate penalties therefor. The claimants of the tug excepted to the

libel, the exceptions were sustained by the district court, and the government appealed.

*Edward Mitchel*, U. S. Atty., and *Abram J. Rose*, Asst. U. S. Atty. *Alexander & Ash*, for claimants.

LACOMBE, J., (*after, stating the facts as above.*)  But a single offense was committed by the tug, and there can be recovered, if at all, but one penalty therefor.  It will be unnecessary to consider, therefore, any count or cause of action other than the one set out under the first section.  If the vessel cannot be found in fault under the broad language of this section, it certainly cannot be so held under any of the others; and, if a violation of the first section can be shown, the penalty will be enforceable, and no inquiry into any alleged violation of the other sections will be necessary or profitable.  On behalf of the tug, it is contended— *First*, that the acts complained of were not committed in waters adjacent or tributary to the harbor of New York, within the meaning of those words as used in the act; and, *secondly*, that the supervisor of the harbor has never prescribed the limits within which material shall not be dumped, and that, therefore, the prohibition of the statute has never taken effect.

The description of the waters with which the act is concerned—a description contained in the first section—seems to be drawn with great care, and sets forth comprehensively and clearly just what area is the subject of legislation.  The phrase used is, "in the tidal waters of the harbor of New York, or its adjacent or tributary waters, or in those of Long Island sound."  This language seems too plain to call for construction.  The bodies of water referred to are (*a*) the harbor of New York, (*b*) waters adjacent to the harbor of New York, (*c*) waters tributary to the harbor of New York, (*d*) Long Island sound; and as to each of these bodies of water there is a restriction of the application of the act to such waters only as are tidal.  As to this enumeration, it is to be noted that it covers not only the harbor proper, but also water-ways by which commerce reaches that harbor, and it covers all such water-ways as are tidal. That congress chose this language with a full appreciation of its meaning, and of the geographical situation to be dealt with, is plain from the reference to Long Island sound.  This body of water would not be included within the three general enumerations, (*a, b, c, supra.*)  It is not adjacent to the harbor of New York, as the respondent argues.  A part of the East river is included within that harbor, but that river runs beyond the harbor as far as Throgg's neck and Willett's point, where the Sound begins.  The words "adjacent to" would therefore cover (to the eastward) only the East river, and to bring Long Island sound within the provisions of the act, it was necessary to name it.

Much was said upon the argument as to the harshness of a statute containing so comprehensive a condemnation of acts the doing of which could, it was urged, work no harm to the harbor.  Such considerations, however, are for congress only.  The legislation is concerned with a great

harbor, and the water-ways through which commerce approaches it. It may well be that congress was satisfied that the only way to preserve them was by legislation of a drastic character, which should prevent the deposit of any foreign substance therein, except to such extent as a local officer charged with the oversight thereof might permit. At any rate, there is no obscurity in the language used. The rule in such cases is expressed by Judge WALLACE, delivering the opinion of this court, in *U. S.* v. *Church of the Holy Trinity,* 36 Fed. Rep. 304:

"Where the terms of a statute are plain, unambiguous, and explicit, the courts are not at liberty to go outside of the language, to search for a meaning which it does not reasonably bear, in the effort to ascertain and give effect to what may be imagined to have been or not to have been the intention of congress. Whenever the will of congress is declared in ample and unequivocal language, that will must be absolutely followed, and it is not admissible to resort to speculations of policy, nor even to the views of members of congress in debate, to find reasons to control or modify the statute. *U. S.* v. *Railroad Co.,* 91 U. S. 72."

The respondent further urges that the supervisor of the harbor has never prescribed the limits within which refuse material, etc., shall not be dumped, and that, therefore, the prohibition of the first section of the statute has never become operative. It is to be noted, in the first place, that congress has confided full power to the designated officer to fix limits for the dumping or deposit of material. That the designation of a line coincident with high-water mark of the waters named in the act, as the limit within which dumping should not be allowed, would be within the power conferred by the act, is not disputed. With the exercise of such discretion the courts have nothing to do. That the designated officer has, by a hasty order, made the first section operative over so extensive an area, when in fact such extension was unnecessary and works great hardship, is not to be inquired into here. All we have to do is to see if the act and the order, taken together, have prescribed such limits as will make the acts which the government avers it can prove against the *Sadie* a violation of the provisions of the first section. Such modification of the limits as may be necessary and proper can, no doubt, be obtained, but this court is not the place for that application.

In the next place, it is to be noted that, under the statute, it is not the supervisor of the harbor who is to prohibit dumping, etc., in the tidal waters named in the act. The act itself prohibits such dumping, "within the limits which shall be prescribed" by that officer. These limits which he is to prescribe are the lines or boundaries on one side and the other of which, respectively, such material may and may not be dumped. The order made by him designates two lines, running, one north and the other west, from a point at the intersection of the meridian 73° 55′ 36″ W., and the parallel 40° 31′ N. To the east and south of these lines it is expressly stated that the deposit of refuse material (repeating the phraseology of the first section) must take place. Why these lines are not thus made the limits of dumping within the meaning

of the act, I am at a loss to conceive. Up to them all such material is to be deposited; beyond them it is not to be deposited. The limits being thus fixed, the first section becomes operative, and persons or vessels depositing such material within these lines, upon the waters enumerated in the act, become liable to the penalties prescribed thereby. Undoubtedly, by fixing the limits so far out to sea, the section becomes operative over all the tidal waters named therein, without exception, (save, perhaps, in the case of special permits,) but such result is within the plain letter of the act, and if it operates harshly, the court cannot afford relief. The decision of the district court sustaining the exception to the first cause of action is reversed, and the exception overruled. The decision of the district court as to the second, third, and fourth causes of action is sustained. The respondent did not on the argument object that the first cause of action failed to set forth the limits prescribed. It should do so, in the language used in the second cause of action. The district attorney may serve an amended libel, in accordance with this decision, within five days, and respondent may have the usual time to answer the same. No costs of either court to either party on this appeal.