UNION PAC. RY. CO. v. KARGES et al

(Circuit Court, D. Nebraska, Omaha Division. May 4, 1909.)

1. PUBLIC LANDS (§ 51*)—GRANTS—NEBRASKA ORGANIZATION ACT.

Act Cong. May 30, 1854, c. 59, § 16, 10 Stat. 283, organizing the territory of Nebraska, and providing that sections 16 and 36 in each township in the territory shall be and are reserved to be applied to schools in the territory and the states and territories to be erected out of the same, was a mere reservation of the sections for the purpose specified;

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

no grant of such sections being made until by Enabling Act April 19, 1864, c. 59, § 7, 13 Stat. 49, declaring that such sections in each township not otherwise disposed of, or other equivalent lands, were granted to the state for school purposes.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 138; Dec. Dig. § 51.*]

2. PUBLIC LANDS (§ 7*)—SCHOOL LANDS—RIGHTS OF STATE—VESTED RIGHTS.

Prior to Act Cong. April 19, 1864, c. 59, 13 Stat. 47, organizing the state of Nebraska, that state acquired no vested right in sections 16 and 36 in each township granted by the act for school purposes, and hence, prior to such act, Congress had full power to dispose of such sections as it saw fit.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 7; Dec. Dig. § 7.*]

3. PUBLIC LANDS (§ 6*)—STATUTORY PROVISIONS—CONSTRUCTION.

The rule that the words "public lands" mean such land as is subject to sale or further disposition under general laws, and not such as is reserved by competent authority for any purpose, or in any manner, although no exception thereof is made, does not conflict with the doctrine that, where it clearly appears from the statute that the term is intended to include lands theretofore reserved for a specific purpose, such intention will prevail, under the rule that a legislative act is to be interpreted according to the plain intention of the Legislature.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 6.*]

For other definitions, see Words and Phrases, vol. 6, pp. 5793–5795; vol. 8, p. 7772.]

4. PUBLIC LANDS (§ 71*)—GRANTS TO RAILROADS—CONSTRUCTION—VESTING TITLE IN COMPANY.

Act July 1, 1862, c. 120, § 2, 12 Stat. 491, granted to the Union Pacific Railroad the right to take from the public lands adjacent to its line a right of way 400 feet wide, where the railway passes over the public lands, and that the United States should extinguish as rapidly as possible Indian titles to all lands falling under the operation of the act and required for such right of way. Held, that such act granted to the railroad company a right of way across land reserved for school purposes in Nebraska prior to the state acquiring a vested right therein by virtue of Enabling Act (Act Cong. April 19, 1864, c. 59, 13 Stat. 49) § 7.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 232; Dec. Dig. § 71.*]

5. ADVERSE POSSESSION (§ 8*)—PROPERTY SUBJECT—PUBLIC LANDS—RAILROAD RIGHT OF WAY.

The right of way over public land, granted by Congress to the Union Pacific Railway Company by Act July 1, 1862, c. 120, § 2, 12 Stat. 489, could not be lost to the railroad company by adverse possession; such right of way being regarded as a public highway, and essential to the performance by the railroad company of public duties assumed on its acceptance of the grant.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. § 43; Dec. Dig. § 8.*]

Acquisition or loss of right to railroad right of way by prescription, see note to Louisville & N. R. Co. v. Smith, 63 C. C. A. 7.]

N. H. Loomis and Edson Rich, for complainant.

A. M. Post, for respondents.

Before W. H. MUNGER and T. C. MUNGER, District Judges.

W. H. MUNGER, District Judge. The pleadings in this case present two issues of law simply: First, whether the act of Congress, granting a right of way to the Union Pacific Railway Company, granted such right of way across sections 16 and 36 that had theretofore been set apart for school purposes; and, second, whether or not respondents have acquired any right to a portion of such right of way by adverse possession.

The several provisions of the statutes applicable to a consideration of this case are hereinafter quoted. Section 16 of the congressional enactment of May 30, 1854, organizing the territory of Nebraska, is as follows:

"And be it further enacted, that, when the lands in said territory shall be surveyed under the direction of the government of the United States, preparatory to bringing the same into market, sections number sixteen and thirty-six in each township in said territory shall be, and the same are hereby, reserved for the purpose of being applied to schools in said territory and in the states and territories hereafter to be erected out of the same." Chapter 59, 10 Stat. 277.

By this section no grant of the lands was made. It simply constituted a reservation of the sections for the purpose specified. No grant of these sections was made to the territory or state until the enabling act of April 19, 1864 (chapter 59, 13 Stat. 47), section 7 of which reads as follows:

"And be it further enacted, that sections number sixteen and thirty-six in every township, and when such sections have been sold or otherwise disposed of by any act of Congress, other lands equivalent thereto, in legal subdivisions of not less than one quarter section, and as contiguous as may be, shall be, and are hereby, granted to said state for the support of common schools."

This is the first enactment containing a grant of these sections, and upon the acceptance by the state of the enabling act, and the state's admission into the Union, a vested right to these sections was first acquired. Nebraska was organized as a state in February, 1867, and accepted the provisions of the enabling act. By such acceptance on the part of the state, it acquired a vested right to sections 16 and 36 in each township which had not, at the time, been in any manner disposed of by the United States. Until such vested right was acquired, Congress had full power and authority to make such disposition of these sections, or portions thereof, as it saw fit. State of Minn. v. Batchelder, 1 Wall. 109, 17 L. Ed. 551; Frisbie v. Whitney, 9 Wall. 187, 19 L. Ed. 668; Emblen v. Lincoln Land Co., 184 U. S. 660, 22 Sup. Ct. 523, 46 L. Ed. 736.

In July, 1862, after the lands in question had been surveyed under authority of the government of the United States, but before any vested right to them had been acquired, Congress granted to the Union Pacific Railway Company a charter with power to construct a railroad from a point on the Missouri river westward, and granted to such railroad company a right of way over the public lands; the provisions of the act granting the right of way being as follows:

"And be it further enacted, that the right of way through the public lands be, and the same is hereby, granted to said company for the construction of

said railroad and telegraph line; and the right, power and authority is hereby given to said company to take from the public lands adjacent to the line of said road, earth, stone, timber, and other materials for the construction thereof; said right of way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad where it may pass over the public lands, including all necessary grounds for stations, buildings, workshops, and depots, machine shops, switches, side-tracks, turn-tables, and water stations. The United States shall extinguish as rapidly as may be the Indian titles to all lands, falling under the operation of this act and required for the said right of way and grants hereinafter made." Chapter 120, § 2, 12 Stat. 489.

This section granted the right of way over the public lands, and, as sections 16 and 36 had theretofore been reserved for school purposes, the contention is that said sections did not, at the time of the passage of this act, fall within the designation of public lands. and hence that the railroad company did not acquire a right of way over those sections.

The true rule respecting the term "public lands" was stated by Judge Van Devanter, sitting in the Court of Appeals, in Northern Lumber Co. v. O'Brien, 139 Fed. 614–616, 71 C. C. A. 598, 600, in the following language:

"The words 'public land' have long had a settled meaning in the legislation of Congress, and, when a different intention is not clearly expressed, are used to designate such land as is subject to sale or other disposal under general laws, but not such as is reserved by competent authority for any purpose or in any manner, although no exception of it is made. Bardon v. Northern Pacific R. R. Co., 145 U. S. 535, 12 Sup. Ct. 856, 36 L. Ed. 806; Wilcox v. McConnel, 13 Pet. 498, 513, 10 L. Ed. 264; Leavenworth, etc., R. R. Co. v. United States. 92 U. S. 733, 741, 745, 23 L. Ed. 634; Newhall v. Sanger, 92 U. S. 761, 23 L. Ed. 769; Doolan v. Carr, 125 U. S. 618, 630, 8 Sup. Ct. 1228, 31 L. Ed. 844; Cameron v. United States, 148 U. S. 301, 309, 13 Sup. Ct. 595, 37 L. Ed. 459; Mann v. Tacoma Land Co., 153 U. S. 273, 284. 14 Sup. Ct. 820, 38 L. Ed. 714; Barker v. Harvey, 181 U. S. 481, 490, 21 Sup. Ct. 690, 45 L. .Ed. 963; Scott v. Carew, 196 U. S. 100, 109, 25 Sup. Ct. 193, 49 L. Ed. 403."

These decisions do not conflict with the settled doctrine that, where it clearly appears from the statute that the term "public lands" is intended to include lands which have theretofore been reserved by Congress for a specific purpose, such intention will prevail, as it is a fundamental rule of construction that a legislative act is to be interpreted according to the plain intention of the legislative body.

As said by the Supreme Court, in Winona & St. Peter R. R. Co. v. Barney, 113 U. S. 618–625, 5 Sup. Ct. 606, 609, 28 L. Ed. 1109, speaking with respect to acts of Congress making grants of certain lands:

"They are to receive such a construction as will carry out the intent of Congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance. To ascertain that intent we must look to the condition of the country when the acts were passed, as well as to the purpose declared on their face, and read all parts of them together."

To the same effect are Wilkinson v. Leland, 2 Pet. 627, 7 L. Ed. 542; Priesman v. U. S.. 4 Dall. 28, 1 L. Ed. 727; U. S. v. Wiltberger, 5 Wheat. 76, 5 L. Ed. 37; Platt v. Union Pacific R. R. Co., 99 U. S. 48, 25 L. Ed. 424.

As to what was the intent of Congress, in granting this right of way to the Union Pacific Railway Company, it is proper to inquire what were the conditions existing at the time. and what was the aim and purpose of Congress in passing the enactment. This was fully expressed in United States v. U. P. R. R. Co., 91 U. S. 72–79, 23 L. Ed. 224, as follows:

"Many of the provisions in the original act of 1862 are outside of the usual course of legislative action concerning grants to railroads, and cannot be properly construed without reference to the circumstances which existed when it was passed. The War of the Rebellion was in progress; and, owing to complications with England, the country had become alarmed for the safety of our Pacific possessions. The loss of them was feared in case those complications should result in an open rupture; but, even if this fear were groundless, it was quite apparent that we were unable to furnish that degree of protection to the people occupying them which every government owes to its citizens. It is true, the threatened danger was happily averted; but wisdom pointed out the necessity of making suitable provision for the future. This could be done in no better way than by the construction of a railroad across the continent. Such a road would bind together the widely separated parts of our common country, and furnish a cheap and expeditious mode for the transportation of troops and supplies. If it did nothing more than afford the required protection to the Pacific States, it was felt that the government, in the performance of an imperative duty, could not justly withhold the aid necessary to build it; and so strong and pervading was this opinion that it is by no means certain that the people would not have justified Congress if it had departed from the then settled policy of the country regarding works of internal improvement, and charged the government itself with the direct execution of the enterprise.

"This enterprise was viewed as a national undertaking for national purposes, and the public mind was directed to the end in view, rather than to the particular means of securing it. Although this road was a military necessity, there were other reasons active at the time in producing an opinion for its completion besides the protection of an exposed frontier. There was a vast unpeopled territory lying between the Missouri and Sacramento rivers which was practically worthless without the facilities afforded by a railroad for the transportation of persons and property. With its construction, the agricultural and mineral resources of this territory could be developed, settlements made where settlements were possible, and thereby the wealth and power of the United States largely increased. And there was also the pressing want, in time of peace even, of an improved and cheaper method for the transportation of the mails, and of supplies for the army and the Indians. It was in the presence of these facts that Congress undertook to deal with the subject of this railroad. The difficulties in the way of building it were great, and by many intelligent persons considered insurmountable. * * *

"Congress acted with reference to a state of things believed at the time to exist, and, in interpreting its legislation, no aid can be derived from subsequent events. The project of building the road was not conceived for private ends, and the prevalent opinion was that it could not be worked out by private capital alone. It was a national work, originating in national necessities, and requiring national assistance. * * * That there should, however, be no doubt of the national character of the contemplated work, the body of the act contains these significant words: 'And the better to accomplish the object of this act—namely, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the government at all times (but particularly in time of war) the use and benefits of the same for postal, military, and other purposes—Congress may at any time, having due regard for the rights of said companies named herein, add to, alter, amend, or repeal this act.' 12 Stat. 497. Indeed, the whole act contains unmistakable evidence that, if

·Congress was put to the necessity of carrying on a great public enterprise by ·the instrumentality of private corporations, it took care that there should be ·no misunderstanding about the objects to be attained, or the motives which influenced its action. * * *

"Confessedly, the undertaking was beyond the ability of unaided private ·capital. Only by the helping hand of Congress could the problem, difficult of solution under the most favorable circumstances, be worked out. Local business, as a source of profit, could not be expected while the road was in course ·of construction, on account of the character of the country it traversed; and whether, when completed, it would prove valuable as an investment, was a question for time to determine. *But vast as was the work, limited as were the private resources to build it, the growing wants as well as the existing and future military necessities of the country demanded that it be completed. Under the stimulus of these considerations Congress acted, not for the benefit of private persons, nor in their interest, but for an object deemed essential to the security as well as to the prosperity of the nation.*" (Italics my ·own.)

Thus it will be seen that the object and purpose which Congress had in view was to secure, at an early date, the actual construction and operation of a railroad from the Missouri river to the Pacific ·Coast, not for private purposes, but for the national welfare, and it ·cannot be supposed that Congress intended that such national object should be thwarted by the inability of the company to construct this ·road across lands belonging to the United States, but which had been reserved for other purposes. This view is, I think, made plain also by comparing the language of section 2, granting the right of way, with the language of section 3, which gave to the railroad company, ·to aid in its construction, every alternate section of public land designated by odd numbers, to the amount of five alternate sections per mile on each side of said road, "not sold, reserved, or otherwise disposed of by the United States and to which a pre-emption or homestead ·claim may not have attached at the time the line of said road is definitely fixed." By section 2 the grant of the right of way was in ·presenti, and contained no reservations; whereas, by the terms of section 3, granting the fee to the respective sections, to aid in the construction of the road, the grant was afloat until the line of the road ·was definitely fixed, and specifically excepted from its operations lands which, at the time the line of the road was definitely fixed, had been ·sold, reserved, or otherwise disposed of.

Construing the act as a whole, Congress having made reservation in ·the third section of the act relative to the aid lands, and made no reservation in the section granting the right of way, and further ·considering the national necessities for the construction of the road, it appears clear that it was the intention of Congress to grant such right of way over the lands the title of which was in the United States, .and to which no other party had acquired a vested right.

The Supreme Court, in Railroad Co. v. Baldwin, 103 U. S. 426–·429, 26 L. Ed. 578, after considering the provisions of an act grant-ing certain sections to aid in the construction of a railroad, which ·contained reservations similar to those of the act in question, refer-ring to the provision of the act granting the right of way, said:

"But the grant of the right of way by the sixth section contains no reserva-·tions or exceptions. It is a present absolute grant, subject to no conditions

except those necessarily implied, such as that the road shall be constructed and used for the purposes designed. Nor is there anything in the policy of the government with respect to the public lands which would call for any qualification of the terms. Those lands would not be the less valuable for settlement by a road running through them. On the contrary, their value would be greatly enhanced thereby. The right of way for the whole distance of the proposed route was a very important part of the aid given. If the company could be compelled to purchase its way over any section that might be occupied in advance of its location, very serious obstacles would be often imposed to the progress of the road. For any loss of lands by settlement or reservation, other lands are given; but, for the loss of the right of way by these means, no compensation is provided, nor could any be given by the substitution of another route. *The uncertainty as to the ultimate location of the line of the road is recognized throughout the act, and where any qualification is intended in the operation of the grant of lands, from this circumstance, it is designated. Had a similar qualification upon the absolute grant of the right of way been intended, it can hardly be doubted that it would have been expressed. The fact that none is expressed is conclusive that none exists.*" (Italics my own.)

In Kindred et al. v. Union Pacific Railway Co., 168 Fed. 648, the Court of Appeals of this circuit, in an opinion filed February 12th last, discussing sections 2 and 3 of the act in question, say:

"The exceptions and reservations found in section 3 of the act related to the donation of lands in aid of the construction of the railroad, and doubtless included Indian reservations like that of the Delawares. They are the customary exceptions and reservations in such cases, but it is apparent they have no relation to the right of way granted by the second section. The application of them exclusively to the land grant indicates the intention of Congress to give a right of way across all lands without exception so far as it was within its power to do so."

Other cases in point are: U. S. v. Bisel, 8 Mont. 20, 19 Pac. 251; Barkley v. U. S., 3 Wash. T. 522, 19 Pac. 36; U. S. v. Elliot, 12 Utah, 119, 41 Pac. 720; Coleman v. St. Paul, M. & N. Ry. Co., 38 Minn. 260, 36 N. W. 638; Peterson v. Baker, 39 Wash. 275, 81 Pac. 681; Riverside Township v. Newton, 11 S. D. 120, 75 N. W. 899; Union Pacific Railway Co. v. Douglas County (C. C.) 31 Fed. 540.

The claim of adverse possession was disposed of by the Court of Appeals in Kindred v. U. P. R. R. Co., supra, wherein it is said:

"It was conclusively determined by the act of Congress that a right of way 400 feet in width was essential to the performance of the public duties assumed by the grantee upon its acceptance of the grant. No part of that right of way could be alienated without the consent of Congress nor lost by laches or acquiescence. Northern Pacific v. Smith, 171 U. S. 260, 18 Sup. Ct. 794, 43 L. Ed. 157; Northern Pacific v. Townsend, 190 U. S. 267, 23 Sup. Ct. 671, 47 L. Ed. 1044; Northern Pacific v. Ely, 197 U. S. 1, 25 Sup. Ct. 302, 49 L. Ed. 639. It became in a sense a national public highway, and private encroachments upon it could be neither strengthened nor confirmed by lapse of time. Possession of portions thereof by individuals was not adverse in the sense that it might ripen into title, nor, however long it was permitted to continue, did it preclude the railroad company from performing its duty by asserting its right thereto whenever the necessity for the full use arose. That for a long time it maintained its right of way fences within the exterior limits of the strip gave the adjacent landowners nothing more than a permissive use of the uninclosed portions, and when it became inconsistent with the public use to which the right of way was dedicated by Congress the railroad company properly removed its fences and resumed possession. Under such circumstances it cannot be said, when it applied to a court of equity to protect the right of way from continued encroachments, that it came with unclean hands."

169 F.—30

For these reasons I think the demurrer to the cross-bill should be sustained, and that complainant is entitled to a decree upon the bill and answer.

T. C. MUNGER. I concur.