CITY OF RENO v. SOUTHERN PAC. CO. et al.

(No. 3410.)

(Circuit Court of Appeals, Ninth Circuit. October 18, 1920.)

1. **Public lands** ⬅92—**Grant of right of way to Central Pacific Railroad Company in præsenti.**

Act July 1, 1862, *held* to have granted to the Central Pacific Railroad Company of California in præsenti right of way for its road through the territory of Nevada over all land which was then public land of the United States the title of the company to which attached on the definite location of its route as of the date of the act, and any rights acquired by others to the lands under the land laws subsequent to that date *held* subject to such grant.

2. **Public lands** ⬅92—**Grant of right of way to Central Pacific Railroad Company unconditional.**

In Act July 1, 1862, granting to the Union Pacific Railroad Company and the Central Pacific Railroad Company of California right of way through the public lands and also subsidy lands, the conditions attached to the subsidy grant that the lands shall be free from homestead or other claims at the date of definite location are not contained in the grant of right of way, and do not apply thereto, but such grant applies to all lands the title to which was then in the United States and which were then subject to disposition by Congress.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Public lands ☞92—Congress may grant right of way over, irrespective of state action.**

It is within the jurisdiction of Congress to grant to a railroad company right of way through public lands of the United States in a state or territory, and the exercise of such power is not dependent on legislative action by state in which the company is incorporated or by the state or territory in which the land lies.

4. **Public lands ☞31—Settler on unsurveyed land acquires no vested right against the government.**

A settler upon unsurveyed public land acquires no vested right until survey and entry which will prevent the government from otherwise disposing of the land.

5. **Public lands ☞92—Unsurveyed land is "public land," although occupied by settler.**

A tract of land within the unsurveyed lands of the United States in the territory of Nevada *held* "public land," within the meaning of Act July 1, 1862, § 2, granting right of way through the public lands to the Central Pacific Railroad Company of California, although a part of such tract was then occupied by a settler, who afterward filed a pre-emption claim thereon.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Public Land.]

6. **Public lands ☞34—Statutory conditions to pre-emption right of settler.**

Under Act June 2, 1862, a settler on unsurveyed public land acquired no pre-emption right, unless he complied with the requirement of the act by filing notice of the specific tract claimed within six months after the survey in the field.

7. **Public lands ☞92—Patent to pre-emption subject to railroad right of way.**

A patent for a pre-emption, following proceedings in the Land Office, in which the claim was filed subsequent to the grant of a right of way to a railroad company, *held* to convey title subject to such right of way.

Appeal from the District Court of the United States for the District of Nevada; Edward S. Farrington, Judge.

Suit in equity by the Southern Pacific Company and Central Pacific Railway Company against City of Reno. Decree for complainants, and defendant appeals. Affirmed.

For opinion below, see 257 Fed. 450.

Le Roy F. Pike, H. V. Morehouse, and L. D. Summerfield, all of Reno, Nev., for appellant.

Brown & Belford, of Reno, Nev., and Guy V. Shoup, Chas. R. Lewers, and Wm. F. Herrin, all of San Francisco, Cal., for appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. This suit was brought by the Southern Pacific Company and Central Pacific Railway Company against the city of Reno, Nev., to quiet title to a strip of ground 300 feet in length and 92 feet in width, situate between Plaza street and the Central Pacific Railway Company track in Reno. The strip is included in the S. W. ¼ of the N. E. ¼ of section 11, township 19 north, range 19 east, M. D. B. & M. The District Court made a decree in favor of the railroad companies, plaintiffs below, and the city appeals.

The Central Pacific Railway Company is the successor in interest of

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the Central Pacific Railroad Company of California. The Southern Pacific is the lessee of the railroad and right of way of the Central Pacific Railway Company. The city claims that there was a dedication by Charles Crocker, successor to one Myron Lake; that on August 1, 1868, Crocker filed a map of the city of Reno with the county clerk of Washoe county, Nev., on which map the land in question was subdivided into blocks and lots, which were intersected by streets and alleys; that one tract, which includes the piece in controversy, was left open and marked "Plaza"; that such tract has always remained open and uninclosed; that in the sales of lots by Crocker, in accordance with this map or plat, all conveyances referred to corresponding numbers of lots or names on the map, and all lots were sold in reference to the map and to the plaza. It is contended that Lake settled upon the land involved as a pre-emption claimant April 22, 1861, filed a declaratory statement as a pre-emption claimant on March 3, 1864, and that the settlement by Lake as a pre-emption claimant was valid against any grant made by Congress to the Central Pacific Railway Company of California, and that afterwards, on August 10, 1865, Lake received patent for the land, and conveyed it, together with other land, to Charles Crocker by deed dated March 22, 1868.

The railroad companies claim title on the ground that the land in question lies wholly within 200 feet of the Central Pacific Railway Company's right of way, and that such right of way was acquired by the Central Pacific Railway Company as the successor of the Central Pacific Railroad Company of California; that the last company obtained title to the tract by the act of July 1, 1862, granting a right of way to Central Pacific Railroad Company of California and the Union Pacific Railroad Company, and also under the acts of Congress of July 2, 1864 (13 Stat. 356), and July 2, 1866 (14 Stat. 79); and that the right of way was paramount to any claim of title of Myron Lake, predecessor of the city of Reno. Appellees also claim that upon the date when Lake claimed settlement (April 22, 1861) the township embracing the tract was unsurveyed public lands of the United States; that the government survey of the township was made in the field and completed on July 18, 1864; that no notice that the tract embraced in Lake's pre-emption claim was claimed as a pre-emption was ever filed with the Surveyor General, as required by the provisions of section 1 of the act of Congress of June 2, 1862 (12 Stat. 413). Appellees also claim that Lake made no improvements of any kind on the tract in question, or on any land north of the Truckee river, prior to 1864, and that his settlement and improvements were south thereof; that on July 1, 1862, the land involved was a part of the public lands of the United States, unless Lake had acquired a right therein whereby said land ceased to be public land within the meaning of section 2 of the act of July 1, 1862 (12 Stat. 491).

From 1879 to 1899 the city of Reno rented from the Central Pacific Railroad a part of the tract in controversy for the use of a fire house, and upon demand by the Southern Pacific Company removed the fire house in 1899 or 1900. The railroad companies also point out that

268 F.—48

the city in 1907 assessed to the Central Pacific Railway Company certain improvements on a street abutting the tract in controversy, and that that company in 1908 paid such assessed taxes.

The principal assignments are that it was error in the court to hold that the plaintiff corporations had a grant for a right of way over and across the lands involved at any time prior to Lake's pre-emption right, and that Lake's pre-emption claim was not initiated prior to any grant of right of way of the plaintiffs; that the court erred in holding that the issuance of the patent by the United States to Lake was not conclusive and binding upon the railroad company as to every matter of fact necessary to be passed upon by the United States before the issuance of the patent; and that it was error to permit the railroad companies to dispute the facts set forth in Lake's declaratory statement in his application for pre-emption filing, particularly the statement that he had settled upon the lands in 1861.

It was stipulated between the parties that on July 1, 1862, the Central Pacific Railroad Company of California, a California corporation, received from the United States—

"a grant of a railroad right of way through the public lands of the United States to the extent of 200 feet in width on each side of said railroad, where it may pass over the public lands, including all necessary grants for stations, buildings, workshops, and depots, machine shops, switches, side tracks, turn-tables, and water stations, said railroad and right of way to extend from the Pacific Coast, at or near San Francisco or the navigable waters of the Sacramento river across the states of California, Nevada, and Utah, to connect with the Union Pacific Railroad at or near Ogden." 12 Stat. 489.

It was further stipulated that the Central Pacific Railroad of California constructed a standard gauge railroad as contemplated by the act of Congress just referred to; that a map of said road as located and constructed was filed in the United States Land Office on November 14, 1867; that the tract in litigation is within 200 feet of the center line of the railroad so constructed; that the section so constructed through said tract was duly approved and accepted by the government; and that it has been used for the purposes contemplated by the act.

Regarding the stipulation as not strictly binding the appellant to any precise legal construction as to a grant, we have considered the position taken, namely, that the Central Pacific Railroad Company of California was not given a grant of a right of way in Nevada by express words either in the act of 1862 or in the act of 1864, and only impliedly by the act of July 3, 1866 (14 Stat. 79). The argument of appellant is that the act of Congress of July 1, 1862, limited the grant in the first instance to the eastern boundary of California and in the second instance to the completion of its railroad across the state of California, and that there never was a grant or right given to the Central Pacific Railroad Company of California in the state of Nevada until its road was completed across the state of California; that the title of the Central Pacific Railroad to any portion of its claimed right of way in the state of Nevada was subject to defeat by settlement thereon and pre-emption made by a bona fide claimant at any time prior to the completion of the Central Pacific in the state of California.

[1] Section 2 of the act of July 1, 1862, granted to the Union Pacific the right of way through the public lands to the extent of 200 feet on each side of the railroad where it may pass over public lands. Section 3 granted to the Union Pacific every alternate section not sold, reserved, or otherwise disposed of by the United States, "and to which a pre-emption or homestead claim may not have attached at the time the line of said road is definitely fixed." Sections 9 and 10 are as follows:

"Sec. 9. * * * The Central Pacific Railroad Company of California, a corporation existing under the laws of the state of California, are hereby authorized to construct a railroad and telegraph line from the Pacific Coast, at or near San Francisco, or the navigable waters of the Sacramento river, to the eastern boundary of California, upon the same terms and conditions, in all respects, as are contained in this act for the construction of said railroad and telegraph line first mentioned, and to meet and connect with the first mentioned railroad and telegraph line on the eastern boundary of California."

"Sec. 10. * * * And the Central Pacific Railroad Company of California, after completing its road across said state, is authorized to continue the construction of said railroad and telegraph * * * to the Missouri river, including the branch roads specified in this act, upon the routes hereinbefore and hereinafter indicated, on the terms and conditions provided in this act in relation to the said Union Pacific Railroad Company, until said roads shall meet and connect, and the whole line of said railroad and branches and telegraph is completed."

Obviously, the grant of rights of way in both states formed a continuous line, the one being as necessary as the other; both were essential to the completion of the great transcontinental road which Congress contemplated and authorized by the act referred to. By section 9 the Central Pacific Railroad Company of California was authorized to construct from the Pacific Coast to the eastern boundary of California, "upon the same terms and conditions, in all respects, as are contained" in the act for the construction of the railroad and telegraph line first mentioned—that is, the Union Pacific Railroad Company; and section 10 provides that, in the construction of the road across Nevada, such construction shall be on the terms and conditions provided in the act in relation to the Union Pacific Railroad Company until the Union Pacific and the Central Pacific of California "shall meet and connect and the whole line of said railroad and branches and telegraph is completed."

[2] The Supreme Court, in discussing the act of 1862, in Central Pacific v. Gallatin, 99 U. S. 728, 25 L. Ed. 504, held that for the purpose of building the road from San Francisco, or the navigable waters of the Sacramento river, to the eastern boundary of the state of California, and from there through territories until the Central Pacific met the road of the Union Pacific, all rights, privileges, and franchises were given to the Central Pacific that were granted to the Union Pacific, except the franchise of being a corporation and incidental matters not relevant at all to the present case. The court said:

"The land grants and subsidy bonds to this company were the same in character and quantity as those to the Union Pacific, and the same right of amendment was reserved."

And it was held that by filing acceptances the Central Pacific Company voluntarily submitted itself to such legislative control of Congress as was reserved under the power of amendment.

In Central Pacific Railroad Co. v. Dyer et al., 5 Fed. Cas. 364, Justice Field and Judge Hillyer had before them a bill to quiet title of the Central Pacific Railroad Company as against a number of persons in Nevada. The question involved called for a determination of the estate and interest claimed by them in land over which the line of the railroad constructed by the company ran between the boundary of Nevada and the big bend of the Truckee river in that state. The court discussed the question when did the right of way to the extent of 200 feet on each side of the road vest in the plaintiff under the act of Congress. It was contended by the defendants that the grant of the right of way was subject to the same limitations prescribed by the act concerning grants of the alternate sections, namely, that the land designated was not reserved or otherwise disposed of by the United States, or that a pre-emption or homestead claim had not attached to it at the time the line of the road was definitely fixed. This construction was held to be "clearly incorrect," and Justice Field said:

"The grant of the right of way is a present grant, operating immediately upon the passage of the act, without reservation or exception, and is subject to no conditions except those which are subsequent, or necessarily implied, such as that the road shall be constructed within the period specified, and be afterward maintained and used for the purposes designated. All acquisitions of land over which this right of way was thus granted, made subsequent to the passage of the act, were necessarily subject to the exercise of this right. The reservations and exceptions found in the third section apply only to the grants of land therein mentioned, and do not apply to the grant of the right of way made in the second section."

In Railroad Co. v. Baldwin, 103 U. S. 426, 26 L. Ed. 578, the court, in an action brought by Baldwin to recover from the railroad company damages for entering upon his land in Nebraska and appropriating a strip in the construction of its road, discussed the claim of the railroad company to a right of way over the land under the act of Congress of July 23, 1866, entitled:

"An act for a grant of lands to the state of Kansas to aid in the construction of the Northern Kansas Railroad and telegraph." 14 Stat. 210.

By the sixth section of that act there was granted to the railroad company a right of way through the public lands for the construction of the railroad as proposed, the grant limited to the extent of 100 feet in width on each side of the road where it passed through the public domain. When Congress made the grant, the land claimed by Baldwin was vacant and unoccupied land of the United States before the line of the road over it was definitely located, until October, 1871, while Baldwin acquired whatsoever right he possessed in October, 1869. The railroad company contended that Baldwin took the land subject to its right of way, while Baldwin set up that the grant of the right of way took effect only from the date at which the company filed its maps designating the route with the Secretary of the Interior. The court, again speaking through Justice Field, regarded the act of Congress as making two definite grants—one of lands to

the state of Kansas for the benefit of the railroad company; and the other of a right of way directly to the company itself. The language of the act was regarded as in terms of a grant in præsenti, with the purpose that, when the route of the road was definitely fixed, the title attached from the date of the act to the sections, except such as were taken from its operation by certain clauses mentioned in the act. The court said:

"The right of way for the whole distance of the proposed route was a very important part of the aid given. If the company could be compelled to purchase its way over any section that might be occupied in advance of its location, very serious obstacles would be often imposed to the progress of the road. For any loss of lands by settlement or reservation, other lands are given; but for the loss of the right of way by these means no compensation is provided, nor could any be given by the substitution of another route."

It was also held that all persons who acquired any portion of the public lands after the passage of the act of grant took the same subject to the right of way conferred by it for the proposed road.

In Nielsen v. Northern Pacific Railway Co., 184 Fed. 601, 106 C. C. A. 581, we recognized the distinction made in the decisions of the Supreme Court between the grant of land to aid in the construction of the Northern Pacific Railroad and the grant of a right of way, saying that, while both grants are in præsenti, that of the right of way is not subject to the conditions attached to the land grant, that the lands be free from homestead or other claims at the date of definite location. In support of this doctrine the court cited Railroad Co. v. Baldwin, 103 U. S. 426, 26 L. Ed. 578, and Bybee v. Oregon & California R. Co., 139 U. S. 663, 11 Sup. Ct. 641, 35 L. Ed. 305. We also held that, before the definite location, all persons acquiring any portion of the public lands after the passage of the granting act took the same subject to the right of way for the proposed road.

The amendatory act of Congress of July 2, 1864 (13 Stat. 356), which amended the act of 1862, supra, required the Central Pacific to complete 25 miles of its road in each year after a prescribed time, and the whole line to the California state line within four years, and provided (section 16) that, if the Central Pacific Company should complete its line to the California boundary line before the Union Pacific reached that line, the Central Pacific Company could extend its road eastward 150 miles on "the established route" to meet and connect with the Union Pacific, and that upon doing so the Central Pacific "shall enjoy all the rights, privileges, and benefits conferred by this act on said Union Pacific Railroad Company."

Appellant argues that this is the first grant specifically made to the Central Pacific Company in Nevada, and that it was dependent upon the completion of its road across the state of California upon the established route, before any right of way could attach to any public lands in Nevada, and in no event did the Central Pacific comply with the terms of the act of July 2, 1864, and therefore acquired its first right of way under the act of Congress of July 3, 1866 (14 Stat. 79, § 2). The act of July 3, 1866, was to amend the act of 1862 and the act of July 2, 1864. By section 2 the Union Pacific, with the consent and approval of the Secretary of the Interior, was authorized to

locate, construct, and continue its road from Omaha westward in a continuous completed line until it should meet and connect with the Central Pacific Railroad Company of California, and the Central Pacific, with the consent and approval of the Secretary of the Interior, was authorized to locate, construct, and continue its road eastward in a continuous completed line until it should meet and connect with the Union Pacific: Provided that each company, when the nature of the work required it, could work for an extent of 300 miles in advance of their continuous completed line.

Now, going back to the act of July 2, 1864, which amended the before-mentioned act of 1862, it was provided:

"And any lands granted by this act, or the act to which this is an amendment, shall not defeat or impair any pre-emption, homestead, swamp land, or other lawful claim nor include any government reservation or mineral lands, or the improvements of any bona fide settler, * * * to be ascertained under such rules as have been or may be established by the Commissioner of the General Land Office, in conformity with the provisions of the pre-emption laws." Section 4.

This act of 1864, so far as the present case is concerned, is immaterial, in that it did not restrict the grant of the right of way made in the act of 1862, except to limit the right of way granted to the Central Pacific to an extension of 150 miles easterly from the east boundary line of the state of California in the event that the Central Pacific should reach the boundary line of California before the Union Pacific did. This restriction, however, was taken away by the act of 1866, already cited. By the terms of the act of 1864, construction of 150 miles extension through Nevada was authorized on the established route. Section 16. The Supreme Court has held that the act of 1864 did not confer a new grant, but enlarged that made previously by the act of 1862, and that even as to the alternate odd-numbered sections, which were granted in the act of 1864 to aid in the construction of the road, the grant became effective as of the date of the act of 1862, except as to certain reserved lands specifically enumerated. Missouri, Kan. & Texas R. Co. v. Kansas Pacific R. Co., 97 U. S. 491, 24 L. Ed. 1095; United States v. Burlington & Mo. Riv. R. Co., 98 U. S. 334, 25 L. Ed. 198; Kansas Pacific R. Co. v. A., T. & S. F., 112 U. S. 414, 5 Sup. Ct. 208, 28 L. Ed. 794.

Section 3 of the act of 1862 is the provision granting the alternate odd-numbered sections on each side of the railroad to aid in the construction of the railroad, and specifically provides that it shall not be applicable to land sold, reserved, or otherwise disposed of by the United States, or to which a pre-emption or homestead claim has attached at the time the line of the road is definitely fixed. We do not find such an exception made in section 2 of the act of 1862, wherein there is granted the right of way, and the act of 1864 does not amend or change section 2 of the act of 1862.

The true construction is, we think, that the act of 1862 granted a right of way to the two railroads in severalty. The Union Pacific was to build westward, and the Central Pacific eastward, until they should meet. Under the grant, the right of way vested in each railroad company separately as it was earned through construction. Con-

gress scarcely could have intended, by first mentioning the Union Pacific, to make a grant of a right of way through Nevada to that corporation alone. We find nothing in the amendatory act of 1864 which took away the right given by the act of 1862 to the Central Pacific, except as to the 150-mile limitation, which is not relevant to the present controversy. If there were an established route, it must have been created under the act of 1862, which was the act under which the company was authorized to continue construction through the territories of the United States until the roads met.

We must accept it on the record that the Central Pacific complied with the act of 1864, for there is nothing to show that it failed in compliance, and the stipulation, already referred to, shows construction and filing of a map. The act of 1864, in referring to the established route did not include a route then definitely established as existing at the time of the passage of the act. Section 5 extended the time of designating the general route and filing the map, although under the decision in Stuart v. Union Pacific, 227 U. S. 352, 33 Sup. Ct. 338, 57 L. Ed. 535, even if the line of the route was not definitely located until actual construction, title to the right of way attached upon construction, and became effective as of the date of the act of grant.

One of the main objects of the act of 1866 was to release the Central Pacific from the 150-mile limitation in Nevada, which had been imposed by the act of 1864. No language in the act of 1866 recalls or declares forfeited the right of way granted by the act of July 1, 1862.

[3] It is said that the Central Pacific, having been a California corporation, had limited powers, and could not, at the time of the passage of the act of 1862, transact business or take lands in Nevada. But we are convinced that it was within the jurisdiction of Congress to grant the right of way through the territory of Nevada at the time of the passage of the act of 1862, and that the exercise of such power was not dependent upon legislative action by the state of California or the state of Nevada. Van Wyck v. Knevals, 106 U. S. 360, 369, 1 Sup. Ct. 336, 27 L. Ed. 201.

[4] Passing to an examination of the status of the land in controversy: It is to be remembered that on July 1, 1862, it was unsurveyed, and not until March 3, 1864, was any filing made upon it. Lake settled upon part of the land, and resided thereon from February, 1862. Between March, 1864, and August 10, 1865, survey was made, plat was filed in 1864, and patent was granted for the land in August, 1865. Ordinarily, one who settles upon unsurveyed public lands of the United States acquires no vested right to the tract settled upon until there has been an entry in the local land office.

In Buxton v. Traver, 130 U. S. 232, 9 Sup. Ct. 509, 32 L. Ed. 920, it was held that a settler could not claim that a pre-emption filing attached to the land in a way to prevent the government from disposing of the land prior to payment of the price and prior to the conditions being complied with by the pre-emption claimant. The court recognized that, while certain privileges are given to one who settles upon the public land in advance of the public surveys, whereby such settler is allowed, when the surveys are made and returned, to apply for pur-

chase, if he does so within a specified time after the survey and the return of the township plats, and takes certain other steps, nevertheless the title to the land is subject to the control and disposition by the government, just as it was before the occupancy by such settler. The doctrine of that case is referred to in Northern Pacific Ry. v. Colburn, 164 U. S. 383, 17 Sup. Ct. 98, 41 L. Ed. 479, Northern Pacific. Ry. v. Smith, 171 U. S. 260, 18 Sup. Ct. 794, 43 L. Ed. 157, and Emblen v. Lincoln Land Co., 184 U. S. 660, 22 Sup. Ct. 523, 46 L. Ed. 736, and had the approval of this court in United States v. Hanson, 167 Fed. 881, 93 C. C. A. 371.

[5] Was the tract occupied by Lake included within the words "public lands," as used in section 2 of the act of 1862, or did the occupancy of Lake from April, 1861, to July 1, 1862, give him an equity which took the lands out of the category of public lands, and thus make his title good against the present appellee? In Union Pacific v. Harris, 215 U. S. 386, 30 Sup. Ct. 138, 54 L. Ed. 246, the court had under discussion the act of July 3, 1866 (14 Stat. 159), in a case where a settlement was made in April, 1861, and declaratory statement was filed in the United States Land Office on May 13, 1861. The court, following the usual definition, said that by the words "public lands" the statute meant to describe such as are "subject to sale or other disposal under general law." The case is not authority for departing from the rule of Buxton v. Traver, supra, and other earlier cases, for it appears that Harris had actually made a preemption filing upon the land prior to July 2, 1864, and that the right of way granted to the railroad came through the act of 1864, which act contained a provision for acquiring title through condemnation.

Washington & Idaho R. Co. v. Osborn, 160 U. S. 103, 16 Sup. Ct. 219, 40 L. Ed. 346, cited in the Harris Case, was brought under the right of way act of March 3, 1875, in which is an express provision saving the rights of settlers in possession and a provision for means of condemnation. Holding, as we do, that in the case before us the title of the Central Pacific of California to the right of way vested on July 1, 1862, the meaning of the words "public lands," as used in the act of 1862, is to be determined by that act, rather than by later supplemental or amendatory statutes. The act of 1862 was silent as to any method under which possessory claims of settlers could be condemned or acquired by the railroad company. In the Harris Case, supra, Justice Brewer, writing of conditions in Nebraska, referred to the fact that a large part of Western Nebraska was, at the time of the passage of the act of 1862, unoccupied and unsurveyed, and said:

"The speedy construction of the railroad to the Pacific was desired, and nothing was said about condemnation of the right of way."

Furthermore, at the time of the passage of the act of 1862, the ultimate fee of lands in Nevada was in the government, and there were no rights which the government was under obligation to recognize, if, in the opinion of Congress, public welfare required disposition without relation to possible claims of settlers. St. Joseph & Denver Co. v. Baldwin, supra. We therefore believe that "public lands," as included

within sections 2 and 3 of the act of July 1, 1862, are such lands as remained with the government for ultimate disposition, lands to which the government had not already parted with the fee. There are exceptions from the lands granted by the provisions of the act, and they are mentioned in section 3; but there are no exceptions mentioned in section 2, the public lands through which the right of way is granted. Kindred v. Union Pacific, 168 Fed. 648, 94 C. C. A. 112; Union Pacific v. Karges (C. C.) 169 Fed. 459; Union Pacific v. Greeley, 189 Fed. 1, 110 C. C. A. 571. In expressing this view we are but following the guidance of the Supreme Court as expressed in United States v. Union Pacific, 91 U. S. 72, 23 L. Ed. 224, where the court, through Justice Davis, said that many of the provisions of the act of 1862 are outside of the usual course of legislative action concerning grants to railroads, and could not be construed properly without reference to the circumstances which existed when it was passed. Among other things the court said:

"This enterprise was viewed as a national undertaking for national purposes; and the public mind was directed to the end in view, rather than to the particular means of securing it. * * * There was a vast unpeopled territory lying between the Missouri and Sacramento rivers, which was practically worthless without the facilities afforded by a railroad for the transportation of persons and property. * * * And there was also the pressing want, in time of peace, even, of an improved and cheaper method for the transportation of the mails and of supplies for the army and the Indians. It was in the presence of these facts that Congress undertook to deal with the subject of this railroad. * * * No argument can be drawn from the wisdom which comes after the fact. Congress acted with reference to a state of things believed at the time to exist, and, in interpreting its legislation, no aid can be derived from subsequent events."

We conclude that the land on which Lake had settled had not been sold; nor had it been reserved; nor had it been otherwise disposed of. The title was in the United States, and there had been no homestead or pre-emption claim which attached prior to the passage of the act of 1862. Kansas Pacific R. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566, 28 L. Ed. 1122; Hastings, etc., v. Whitney, 132 U. S. 357, 10 Sup. Ct. 112, 33 L. Ed. 363; Northern Pacific v. Colburn, supra. We use the word "attached" in the sense in which it was defined by Justice Miller, speaking for the court in Kansas Pacific R. v. Dunmeyer, supra. He said, referring to the rule:

"It did not mean mere settlement, residence, or cultivation of the land; but it meant a proceeding in the proper land office, by which the inchoate right to the land was initiated. It meant that by such a proceeding a right of homestead had fastened to that land, which could ripen into a perfect title by future residence and cultivation."

If the case presented a question as between Lake and parties other than the United States and its grantee, different rules might have to be applied; but as between the railroad company and this appellant we conclude that the tract vested in the railroad company on the date of the act of 1862. In the Yosemite Valley Case, 15 Wall. 77, 21 L. Ed. 82, it was held that the pre-emption act was not intended to deprive Congress of the power to make any other disposition of the

lands before they are offered for sale, or to appropriate them to any public use.

We do not find it necessary to go further into a discussion of the relationship of a settler upon unsurveyed lands toward the United States. We recognize that settlements upon unsurveyed lands were authorized in certain states and territories under conditions named in certain acts of Congress, as, for instance, the privileges extended to California under an act of May 30, 1862 (12 Stat. 410, § 7). It may be that the act of June 2, 1862 (12 Stat. 413), which was an act to establish a land office in Colorado, and for other purposes, gave privileges to settlers on unsurveyed lands in Nevada, and it is certain that the act of Congress to establish a land district in Nevada and for other purposes, approved July 2, 1862 (12 Stat. 503), which was a day after the right of way grant act, did extend the pre-emption laws to Nevada.

[6] Under no circumstances, however, did Lake acquire right of preemption prior to the date of filing his declaratory statement, because he failed to comply with the conditions of the act of June 2, 1862, in that he gave no notice of the specific tracts claimed within six months after the survey was made in the field. The statute referred to expressly requires that such notice be filed, and on failure to file it, or to pay for the tracts claimed, within 12 months from the filing of such notice, the party claiming—

"shall forfeit all right thereto: Provided said notices may be filed with the Surveyor General and to be noted by him on the township plats, until other arrangements have been made by law for that purpose."

The only notice that Lake filed was a declaratory statement in the land office at Carson City, Nev., more than 6 months after the survey had been completed in the field, or after July 18, 1863. In Lansdale v. Daniel, 100 U. S. 113, 25 L. Ed. 587, where a declaratory statement was filed before the time when the surveys had been turned into the local land office, the court held that the notice of claim or declaratory statement required by the act then under consideration, the act of March 1, 1854 (10 Stat. 268), was indispensable to give the claimant any standing as a pre-emptor; his settlement alone not being sufficient for that purpose.

[7] The next point calling for special mention is whether the record title of Lake, including his pre-emption filings in the land office and the patent issued to him by the United States for his pre-emption claim, are conclusive of his title to the 400 feet claimed by the railroad company as in the grant of the right of way. The records offered by Lake were competent to show that on March 3, 1864, he declared his intention to settle on the land described in his statement under claim of a right of pre-emption. They were also competent to prove that he made proof, paid the purchase money, and received a patent for the land described, and that when his pre-emption filing was made such land was public land subject to the pre-emption law, and that there was no other occupant or claimant, and that Lake had complied with the requirements of the law. On the other hand, the issuance of the patent did not establish that he had settled on his pre-emption

claim prior to March 3, 1864, or that he had made improvements upon any particular subdivision of his claim.

In Tarpey v. Madsen, 178 U. S. 215, 20 Sup. Ct. 849, 44 L. Ed. 1042, it was held that the land office record was conclusive as to the time when the pre-emption claim attached. The question here involved is whether the land in controversy was a part of the public lands on July 1, 1862, when Congress granted right of way through the public lands. Patent to Lake and the pre-emption records do not establish that he ever acquired title free from the right of way grant to the railroad company, for the filing of a map of definite location and the construction of the road through the pre-emption claim and subsequent to a patent issued, lead to the conclusion that the patent was issued subject to the right of way granted prior to the date of the issuance of the patent. St. Joseph & Denver, etc., Co. v. Baldwin, supra; Bybee v. Oregon & California R. Co., supra; Stuart v. Union Pacific, 227 U. S. 342, 33 Sup. Ct. 338, 57 L. Ed. 535; Lewis v. Rio Grande W. R. Co., 17 Utah, 504, 54 Pac. 981. Under the facts, Crocker having bought from Lake in 1868, when the railroad was at Reno, no attempted dedication by Crocker can defeat the right of the railroad company; but Crocker's deed to the company in 1886 is evidence tending to prove that there never was a dedication.

Appellant having failed to show any ground upon which the title of the railroad company can be disturbed, the decree must be affirmed.

Affirmed.